The TERRITORY OF the UNITED STATES VIRGIN ISLANDS, individually and as assignee of the Successor Panex Industries, Inc. Stockholders Liquidating Trust, Plaintiff,

v.

GOLDMAN, SACHS & CO., a New York limited partnership, Defendant.

C.A. No. 2505–VCS.

Court of Chancery of Delaware.

Submitted: Sept. 27, 2007.
Decided: Dec. 20, 2007.

Bruce E. Jameson, Esquire, Melissa N. Donimirski, Esquire, Prickett, Jones & Elliott, P.A., Wilmington, Delaware; John K. Dema, Esquire, Scott E. Kauff, Esquire, Law Offices of John K. Dema, P.C., Christiansted, St. Croix, U.S. Virgin Islands, Attorneys for Plaintiff.

Andre G. Bouchard, Esquire, Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; Melvin A. Brosterman, Esquire, Joseph E. Strauss, Esquire, Stroock & Stroock & Lavan LLP, Attorneys for Defendant.

## OPINION

STRINE, Vice Chancellor.

In this decision, I grant the motion of defendant Goldman, Sachs & Co. to dismiss a complaint against it by the U.S. Virgin Islands. The Virgin Islands seeks to recoup from Goldman Sachs distributions made to it from a dissolved corporation, Panex Industries, Inc., in 1984 and 1985, and in 1987 from a liquidating trust established during Panex's dissolution, the Liquidating Trust. The Virgin Islands' theory is that Goldman Sachs is liable, to the extent of its receipt of distributions

from Panex and the Liquidating Trust, for any liabilities owed by Panex and the Liquidating Trust, regardless of whether those liabilities were known at the time the distributions were made. In this case, the first claims that certain operations of Panex had caused environmental damage to the Tutu aquifer on St. Thomas, U.S. Virgin Islands were asserted in 1992, and the Virgin Islands itself did not assert such claims until 1996, nine years after the last distributions to Goldman Sachs were made. In fact, as of the time the distributions to Goldman Sachs were made, the Virgin Islands itself had owned and controlled for fifteen years, the former Panex facility that it later alleged was a source of pollution.

More than a generation's worth of corporate and judicial process precedes this ruling and is summarized in the pages that follow. That history is important to the conclusions I reach, which are as follows.

First, I conclude that §§ 278 and 325(b) of the Delaware General Corporation Law bar the Virgin Islands from seeking to hold Goldman Sachs responsible for distributions it received from Panex itself. Because the Virgin Islands never brought suit against Panex, it could not secure a judgment against Panex, a pre-requisite to claiming over against Panex's former stockholders. The reason that the Virgin Islands never brought suit against Panex is that by the time the Virgin Islands got around to bringing a claim for environmental damage, the Third Circuit had already correctly determined that Panex lacked the capacity to sue and be sued at that time by operation of § 278 of the DGCL. Alternatively, even if §§ 278 and 325(b) do not preclude common law making, I would, for reasons I detail, decline to recognize a common law cause of action for a later arising corporate claimant against a stockholder who received a prior distribution in good faith.

Second, because the Virgin Islands did not file a claim against the Liquidating Trust until 1996, well after the Liquidating Trust's original term expired, it has no right to demand that Goldman Sachs return the distributions it received in 1987. After September 12, 1988, the Liquidating Trust only continued in existence to deal with the discrete issue of potential environmental liabilities related to a facility in New York, and not to address unknown claims, such as those later made by the Virgin Islands.

Finally, I conclude that the Virgin Islands is barred in any case by the doctrine of laches. In practical effect, it seeks to hold Goldman Sachs liable for activity undertaken by Panex's predecessors in the 1970s. The Virgin Islands bought the facility in question in 1981 but first raised environmental claims in 1996. In that 1996 suit, the Virgin Islands sued Goldman Sachs, raising essentially the same claims it now raises, but dismissed that suit without prejudice in 1998. Then, the Virgin Islands waited another eight years to sue Goldman Sachs.

The Virgin Islands has filed its claims long after the analogous statutes of limitation require. As important, its late filing puts Goldman Sachs, a passive stockholder of Panex who acquired its shares as compensation for creditor claims in a bankruptcy, in the unfair position of having to defend environmental claims, when it was never an operator of the facility in question, when many key witnesses are dead or have faded memories, and when the Virgin Islands itself has controlled the facility since 1981. And if the Virgin Islands claims that it can recover against Goldman Sachs simply because it obtained a default judgment in 2005 against the successor trust of Panex, which had no funds to

defend itself, the inequity Goldman Sachs faces as a result of the Virgin Islands' torpor is made even plainer.

## I. *Facts*

These facts are drawn from the amended complaint, the documents referenced and incorporated therein, and numerous judicial decisions since Panex's dissolution. The facts relevant to deciding this motion are complicated because they involve numerous entities and span several decades.

### A. *The Predecessor Corporations*

Laga Industries, Ltd., a U.S. Virgin Islands corporation, was organized in 1968 with Paul Lazare and Andreas Gal as its initial stockholders and officers. Laga built and operated a textile manufacturing facility in the Tutu region of St. Thomas, U.S. Virgin Islands (the "Laga Facility" or "Laga"). In 1970, Lazare and Gal sold Laga to the Duplan Corporation, a Delaware corporation, and Duplan began dry-cleaning operations at the Laga Facility. Dry cleaning was the final step in the manufacturing process for certain Duplan textile products.[1] In 1976, Duplan filed for bankruptcy reorganization. Duplan ceased all operations at the Laga Facility in late 1978.[2] As part of the bankruptcy process, Panex Co., a New York partnership formed by Lazare and Gal, purchased the Laga Facility from Duplan's bankruptcy trustee in 1979. Panex Co. sold the Laga Facility to the Virgin Islands Department of Education in 1981. That same year, Duplan emerged from bankruptcy as Panex Industries, Inc. ("Panex"), a Delaware corporation.

### B. *The Post–Bankruptcy Owners Of Panex*

Panex arose from bankruptcy in 1981 with over 300 stockholders;[3] however, most of Panex's stock was held by three groups of stockholders. Lazare and Gal owned approximately 27% of Panex's common stock, Firmanco Associates[4] owned 40%, and Goldman Sachs owned 13%.[5] Lazare and Gal, Firmanco, and Goldman Sachs received shares of Panex stock as part of the bankruptcy process because they were creditors of Duplan before its bankruptcy.[6] Firmanco, in building up to its 40% ownership, also acquired shares of Panex on the open market.[7]

Of the three primary groups of Panex stockholders, Goldman Sachs was the only entirely passive stockholder. Goldman Sachs did not participate in the management of Panex as either a director or officer. Indeed, it appears that Goldman Sachs was never even an eager equity holder. Rather, it received its equity in Panex as compensation for its creditor claims in the Duplan bankruptcy. By contrast, Lazare, Gal and Firmanco actively participated in the management of Panex. Lazare and Gal, who were the initial officers of Laga and served as officers of

---

1. *In re Tutu Wells Contamination Litig.*, 994 F.Supp. 638, 642 (D.Vi.1998).

2. *Rosenbloom v. Esso Virgin Islands, Inc.*, 766 A.2d 451, 454 (Del.2000).

3. *In re Duplan Corp.*, 212 F.3d 144, 149 (2d Cir.2000).

4. First Manhattan Co., itself a limited partnership, was the general partner of Firmanco Associates. Daniel Rosenbloom was the general partner of First Manhattan Co. *In re Tutu Wells Contamination Litig.*, 885 F.Supp. 776, 779 (D.Vi.1995). In this opinion, "Firmanco" will refer to Firmanco Associates, First Manhattan, and Rosenbloom collectively.

5. Am. Compl. ¶ 18.

6. *In re Duplan Corp.*, 212 F.3d at 148.

7. *Id.*

Duplan, were directors of Panex.[8] Firmanco participated in Panex's management through Daniel Rosenbloom, who controlled Firmanco, and served as Chairman of Panex's board of directors.[9]

## C. *The Dissolution Of Panex*

Panex soon returned to the ashes. In August 1984, the Panex board of directors approved a Liquidation Plan for Panex. The Liquidation Plan provided for the disposition of Panex's assets and the use of the proceeds to fund a series of liquidating distributions to be made to its stockholders within one year. The Liquidation Plan also established the Panex Liquidating Trust "to cover contingent and other liabilities of Panex which m[ight] arise during or after the Liquidation Period" and funded it with approximately $6 million.[10] The Liquidation Period is "the twelve-month period beginning on the date on which the Plan of Liquidation is adopted by the Panex stockholders."[11]

On August 31, 1984, Panex issued a proxy statement describing the Liquidation Plan and asking its stockholders to vote for the proposed Liquidation Plan (the "Proxy Statement"). In describing the Liquidating Trust, the Proxy Statement stated the following:

> It is possible that the entire amount which will be held in the Liquidating Trust to cover contingent and other liabilities of Panex will be used to discharge such liabilities.... Moreover, although the Board of Directors believes that the amount of approximately $6 million which will be deposited in the

Liquidating Trust will be sufficient to cover any liabilities which may arise during or after the Liquidation Period, there can be no assurance that this will be the case. If the amount held in the Liquidating Trust is insufficient to discharge fully all liabilities which arise, or if liabilities arise after the Liquidating Trust is terminated, each Panex stockholder may be liable for any unpaid portion of such liabilities to the extent of the liquidating distributions paid to him....[12]

The Proxy Statement focused its disclosure of potential liabilities on potential additional tax liabilities from years still subject to audit by the IRS and made mention of lease and other continuing contractual obligations of Panex.[13] The Proxy Statement did not mention possible environmental liabilities. The Panex stockholders approved the Liquidation Plan on September 24, 1984, and Panex filed its Certificate of Dissolution on April 15, 1985.

## D. *Sections 278 And 325 Of The Delaware General Corporation Code*

When Panex's board sought to dissolve the company, certain provisions of the Delaware General Corporation Law became relevant to its actions. Section 278 of the DGCL was of particular importance to Panex.[14] As then written in 1985, § 278 continued the existence of a corporation for a term of three years after its dissolution for several purposes, including winding-up the business of the corporation and prosecut-

---

8. *In re Tutu Wells Contamination Litig.,* 846 F.Supp. 1243, 1274 (D.Vi.1993).

9. *Tutu Wells,* 885 F.Supp. at 779.

10. Bouchard Aff. Ex. A ("Proxy Statement") at 5.

11. *Id.* at 2.

12. *Id.* at 6.

13. *Id.* at 5.

14. 8 *Del. C.* § 278.

ing and defending suits. The applicable portion of § 278 stated:

> All corporations ... shall nevertheless be continued, for the term of three years from such ... dissolution ..., bodies corporate for the purpose of prosecuting and defending suits ..., and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities, and to distribute to their stockholders any remaining assets, but not for the purpose of continuing the business for which the corporation was organized.[15]

Panex desired certain federal tax benefits that flowed from distributing its assets within one year.[16] Therefore, it used a device that would allow it to satisfy the federal tax code's requirement for a corporation to distribute its assets within a year, while honoring § 278's three-year winding-up period requirement. That device was a liquidating trust.[17]

Section 278 was also relevant to Panex's consideration of the liabilities that might arise after its dissolution. Specifically, § 278, as well as § 325(b) of the DGCL, bore on a question less than ideally certain under Delaware law (and American corporate law more generally): what, if any, liability was owed by corporate stockholders and directors for activities of a dissolved corporation that occurred before its dissolution but where the claims regarding those activities arose only after its dissolution?

On one view, §§ 278 and 325(b) clarified this uncertainty. Under this view, §§ 278 and 325(b) precluded any suit against a dissolved corporation's former stockholders and directors brought after the winding-up period set forth in § 278—three years unless otherwise extended—because the corporation lacked the capacity to be sued. The corporation's lack of the capacity to be sued after the winding-up period is an interpretation of the following portion of § 278, which at the time stated:

> With respect to any action, suit or proceeding begun by or against the corporation either prior to or within three years after the date of its ... dissolution, the corporation shall, for the purpose of such actions, suits or proceedings, be continued as a body corporate beyond the three-year period and until any judgments, orders, or decrees therein shall be fully executed.... [18]

The rationale for such an interpretation is that if a specific statutory provision was required to continue the corporation's existence beyond the three-year winding-up period for the resolution of pending suits, the corporation must have ceased to exist at the end of the three-year period for all other purposes, including prosecuting or defending new lawsuits. Meanwhile, § 325(b) stated at that time: "No suit shall be brought against any officer, director, or stockholder for any debt of a corporation of which he is an officer, director or stockholder, until judgment be obtained therefor against the corporation and execution

**15.** *Id.*

**16.** *See* Comment, *The Use of Liquidating Trusts to Obtain the Benefits of Section 337 of the Internal Revenue Code of 1954,* 34 U. CHI. L.REV. 563, 564 (1967) ("Section 337 requires that a corporation completely distribute all of its assets, 'less assets retained to meet claims,' within a twelve month period from the date it adopts a plan of liquidation if it wishes to

avoid a corporate tax on the sale of appreciated assets.").

**17.** *See City Investing Co. Liquidating Trust v. Cont'l Cas. Co.,* 624 A.2d 1191, 1196 (Del. 1993) ("The acknowledged purpose for establishment of a liquidating trust is tax avoidance.").

**18.** 8 *Del. C.* § 278.

thereon returned unsatisfied."[19] Therefore, one view of the combined effect of §§ 278 and 325(b) was that directors, officers, and stockholders of a corporation could not be held liable for the debts of a corporation after the § 278 winding-up period had expired because no judgment could be obtained against the dissolved corporation, a prerequisite for director, officer, and stockholder liability for the debts of a corporation under § 325(b).[20]

But the comfort given by §§ 278 and 325(b) was lessened by the absence of Delaware case law embracing this interpretation. This gap created doubt because of case law from other jurisdictions applying the so-called trust fund doctrine.[21] This doctrine is a notoriously squishy one,[22] but generally involves the notion that funds distributed from a dissolved corporation to its stockholders constitute a hypothetical trust fund, against which creditors and tort claimants with claims against the dissolved corporation may make claims, by suing the stockholders directly, but only to an extent co-extensive with the defendant-stockholder's receipt of distributions from the defunct corporation.[23] Thus, there existed the concern that §§ 278 and 325(b) did not provide iron-clad protection for directors, officers, and stockholders of a dissolved corporation. The rationale for this view was that the trust fund doctrine might co-exist with corporate dissolution statutes and provide a supplemental method to hold directors, officers, or stockholders liable for debts of a dissolved corporation.[24] Against this backdrop of legal uncertainty, it is unsurprising that Panex made a cautious disclosure of potential post-dissolution stockholder liability in its dissolution Proxy Statement by warning Panex stockholders that they *"may"* face liability for Panex liabilities to the extent of the liquidating

19. 8 *Del. C.* § 325(b).

20. *See, e.g., infra* note 72 and accompanying text.

21. *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 12–7[c] (2007) ("To date, no Delaware court has had occasion to apply the trust fund doctrine in a case by a creditor seeking to recover assets that have been distributed to the stockholders of a dissolved or insolvent corporation. . . .").

22. *See* 15A William M. Fletcher, Cyclopedia of the Law of Corporations § 7369 (2006) ("Perhaps no concept has created as much confusion in the field of corporate law as has the 'trust fund doctrine.' "); *see also* Joseph Jude Norton, *Relationship of Stockholders to Corporate Creditors upon Dissolution: Nature and Implications of the "Trust Fund" Doctrine of Corporate Assets*, 30 Bus. Law. 1061, 1072–77 (1975) (detailing several of the uncertain features of the trust fund doctrine).

23. 19 Am.Jur.2d *Corporations* § 2419 (2007) ("Under the trust fund doctrine, once a corporation is dissolved, the property of a dissolved business corporation ultimately passes to its stockholders as the actual owners of such property, subject, of course, to the payment of the corporate debts. Thus, under the trust fund theory, when the assets of a dissolved corporation are distributed to shareholders, creditors may pursue the assets on the theory that in equity the assets are burdened with a lien in the creditor's favor. Stated another way, the assets of a dissolved corporation become a trust fund against which the corporation's creditors have a claim."); *see also* 15A William M. Fletcher, Cyclopedia of the Law of Corporations § 7369 (2006) (noting that the trust fund doctrine has also been applied to hold directors of a dissolved or insolvent corporation liable for the debts of the corporation when they breach their fiduciary duty by improperly distributing the assets of the corporation).

24. *See* George I. Wallach, *Products Liability: A Remedy in Search of a Defendant–The Effect of a Sale of Assets and Subsequent Dissolution on Product Dissatisfaction Claims*, 41 Mo. L.Rev. 321, 328–35 (1976) (discussing how and why corporate dissolution statutes and the trust fund doctrine might co-exist).

distributions they received from Panex.[25]

### E. *The Creation Of The Panex Liquidating Trust*

After formulating the Liquidation Plan, disclosing its details in the Proxy Statement, obtaining stockholder approval, and filing its certificate of dissolution, the next step in Panex's liquidation process was the execution of the Liquidating Trust Agreement on September 12, 1985. The Liquidating Trust Agreement named Rosenbloom and Gal as the original trustees of the Liquidating Trust.[26] Within a short period, Lazare succeeded Gal as a trustee of the Liquidating Trust.[27] The Liquidating Trust Agreement created a trust that was strictly limited in its purpose, the assets it received, the distributions it could make, and its duration. The Liquidating Trust was

> established for *the sole purpose* of holding the Assets transferred to it by Panex on behalf of the Beneficiaries, enforcing the rights of the Beneficiaries thereto, collecting income thereon, satisfying any and all liabilities of Panex which are not paid or otherwise discharged, distributing the Trust Property to the Beneficiaries, and taking such other action as is necessary to conserve and protect the Trust Property and to provide for the orderly liquidation of any and all of the Assets.[28]

The only assets the Liquidating Trust received from Panex were any assets not readily distributable to the stockholders in kind, assets held on behalf of stockholders who could not be located, and "$6 million as a reserve for possible contingent or other liabilities which may arise during or after consummation of the [Liquidation] Plan." [29] The trustees of the Liquidating Trust were required to pay over to the beneficiaries a distribution at least once annually *"provided, however,* that no distribution shall be made to the Beneficiaries without first satisfying or adequately providing for (i) a reserve for all known or possible contingent or other liabilities, (ii) a reserve for reasonable expenses incurred or to be incurred by the Trustees, and (iii) a reasonable reserve for payments to be paid to Missing Beneficiaries." [30]

By its express terms, the Liquidating Trust was required to terminate within three years after it was established except in certain circumstances.[31] One of those circumstances required "that this Trust Agreement shall continue to exist for a reasonable period beyond three years from the date of this Trust Agreement *for the limited purpose of discharging any known liabilities of the Trust or of Panex or liabilities of the Trust or of Panex which the Trustees have reasonable grounds to believe may be asserted,* but in no event

---

**25.** This uncertainty is not merely the result of my after-the-fact analysis in 2007. The uncertainty was well-known at the time of Panex's dissolution. *See* Joseph Jude Norton, *Relationship of Stockholders to Corporate Creditors upon Dissolution: Nature and Implications of the "Trust Fund" Doctrine of Corporate Assets,* 30 Bus. Law. 1061, 1076 (1975) ("The question arises whether or not the three year period does in fact preclude a creditor's claim under the 'trust fund' doctrine subsequent to the three year period. On this point Delaware case law is silent.").

**26.** Jameson Aff. Ex. 1 ("Trust Agreement") at 1.

**27.** *Rosenbloom,* 766 A.2d at 454; *see also* Trust Agreement ¶ 6.1 (designating Lazare as the successor trustee to Gal if Gal were unable to serve as trustee for any reason).

**28.** Trust Agreement ¶ 3.1 (emphasis added).

**29.** *Id.* at Ex. A ¶ 3.

**30.** Trust Agreement ¶ 3.2.

**31.** *Id.* ¶ 8.1.

beyond 12 years from the date hereof." [32]

Panex made distributions of approximately $64 million to its stockholders between the time the Liquidation Plan was approved in September 1984 and the Liquidating Trust was created and funded with $6 million in September 1985. By July 1987, the statute of limitations for an IRS audit of Panex's 1982 and 1983 tax returns had run. [33] That development, when combined with the absence of any other known or suspected Panex liabilities, prompted the trustees of the Liquidating Trust to distribute approximately $4.5 million to Panex's former stockholders in July 1987. [34]

The Virgin Islands alleges that Goldman Sachs received a total of approximately $9 million in liquidating distributions from Panex and the Liquidating Trust. [35] An opinion from the U.S. District Court for the Virgin Islands details the liquidating distributions. [36] That decision indicates that Goldman Sachs received $9.3 million in liquidating distributions from Panex in 1984 and 1985. [37] In 1987, Goldman Sachs received a $617,000 distribution from the Liquidating Trust. [38]

## F. The Discovery Of Potential Environmental Liabilities In New York And The Extension Of The Liquidating Trust

In April 1988, approximately five months before the three-year period for the existence of the Liquidating Trust expired, the trustees received notice that Panex, as the former parent of Rochester Button, was a potentially responsible party for alleged environmental contamination in New York. [39] As a result, the Liquidating Trust remained in existence beyond its expected three-year duration for the limited purpose of discharging the potential liabilities related to that environmental contamination. Under the Trust Agreement, a specific purpose extension was the only extension available to the trustees. [40] The mechanics and details of the extension of the Liquidating Trust, however, remain a mystery as the court has not received any documentation on the extension of the Liquidating Trust. [41]

## G. Panex Is Sued In The Virgin Islands And Learns Of The Contamination Of The Tutu Aquifer

There is a large aquifer under St. Thomas in the U.S. Virgin Islands. That aquifer is the source of potable water for most

32. *Id.* (emphasis added).

33. *Rosenbloom*, 766 A.2d at 455.

34. *Tutu Wells*, 885 F.Supp. at 781; *Rosenbloom*, 766 A.2d at 455.

35. Am. Compl. ¶¶ 30–31.

36. *Tutu Wells*, 885 F.Supp. at 781.

37. *Id.*

38. *Id.*

39. *See Rosenbloom*, 766 A.2d at 455; *see also New York v. Panex Indus., Inc.*, 1997 WL 627635 (W.D.N.Y.1997) (one of several decisions resulting from and detailing the alleged environmental violations in New York).

40. *See supra* notes 31–32 and accompanying text.

41. Counsel for Goldman Sachs acknowledged the lack of any documentation on the extension of the Liquidating Trust at oral argument—"What I don't know is whether there is a document extending the trust from three to 12....—I don't believe—if it exists, it's not in the papers that we've supplied the Court." Tr. Of Oral Arg. On Def's Mot. To Dismiss (Sept. 27, 2007) at 32. Gaps such as this illustrate the predicament Goldman Sachs faces as a result of the Virgin Islands' tardiness. Goldman Sachs, which had no active role in the administration of the Liquidating Trust, is being forced to recreate and defend actions taken by trustees over twenty years ago.

of that island. In July 1987, a private citizen detected the aroma of gasoline in his well, which drew from the Tutu aquifer.[42] That event inspired the filing of a lawsuit in 1989 (the "VI Environmental Litigation").[43] The plaintiffs in that first action were the owners and operators of the wells that the Department of Planning and Natural Resources of the Territory of the Virgin Islands ordered closed after the discovery of the contamination.[44] Those plaintiffs sued several oil companies and businesses operating on St. Thomas, including Esso Standard Oil, S.A. and Texaco, Inc.[45]

In 1992, four years after the Liquidating Trust had by its terms ceased to exist for any purpose other than discharging any potential liabilities in New York, the trustees of the Liquidating Trust first learned that the Laga Facility was being accused of contributing to contamination of the Tutu aquifer.

The source of the claim was itself somewhat surprising. By 1992, the Virgin Islands had owned the Laga Facility for eleven years, having bought it from Panex Co., a partnership with Lazare and Gal as its only partners, in 1981 for $1.3 million.[46] Yet, in the period when the Facility was under its dominion and control, the Virgin Islands never informed Panex (during its existence) or the Liquidating Trust (thereafter) that the Laga Facility was suspected of having polluted the Tutu aquifer.[47] Indeed, the Virgin Islands did not even make such a claim in 1992.

Rather, the Liquidating Trust learned that the Laga Facility was being targeted as a potential source of pollution of the Tutu aquifer when the plaintiffs in the VI Environmental Litigation amended their complaint to allege that the Laga Facility had also contributed to the pollution of the Tutu aquifer. The plaintiffs sued Panex, as the former owner of the Laga Facility, and Lazare and Gal, in their capacity as former directors and officers of Panex, seeking to hold them responsible under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and under common law tort theories.[48] The existing defendants also filed cross-claims against Panex, Lazare, and Gal, alleging they should bear their proportionate share of liability for clean-up costs.[49]

The emergence of the Virgin Islands claims also put the trustees of the Liquidating Trust in an awkward position. As of 1992, the trustees were Lazare and Rosenbloom.[50] Both of them were directors of Panex when it was an operating entity. Lazare was an officer of Panex

---

42. *Tutu Wells,* 846 F.Supp. at 1249.

43. *Id.* at 1250.

44. *Id.*

45. *Id.*

46. Am. Compl. ¶¶ 15–16; Bouchard Aff. Ex. J ("Virgin Islands Brief to the Third Circuit") at 7.

47. Notifying Panex Co. would have put both Panex and the Liquidating Trust on notice because Lazare and Gal were the only owners of Panex Co. Lazare and Gal were officers of Panex and one of them served as a trustee of the Liquidating Trust at all times during its existence.

48. *Tutu Wells,* 846 F.Supp. at 1250. In addition to the CERCLA claims, there were claims under the Resource Conservation and Recovery Act ("RCRA"). I will refer to the CERCLA and RCRA claims collectively as the CERCLA claims because this is consistent with prior decisions and the RCRA claims were ultimately dismissed with prejudice. *See Tutu Wells,* 994 F.Supp. at 660.

49. *Tutu Wells,* 846 F.Supp. at 1251.

50. *Rosenbloom,* 766 A.2d at 454.

and its predecessor companies and was alleged to have had control over the operations at Laga.[51] As a result, Lazare faced potential liability if he was personally involved in directing the polluting activities at Panex facilities, a liability exposure that flowed out of his official positions, but that ultimately turned on his behavior in his official corporate capacities, and not simply his status as a former officer and director.

### H. The Liquidating Trust Litigation

By 1994, there was environmental litigation pending in New York regarding Rochester Button (the "NY Environmental Litigation"), and environmental litigation pending in the Virgin Islands regarding the Laga Facility. In the N.Y. Environmental Litigation, the defendants related to Panex included Panex; the Liquidating Trust; Rosenbloom and Lazare as trustees of the Liquidating Trust; and Lazare, Gal, Firmanco, and Goldman Sachs as distributees of Panex's assets.[52] In the VI Environmental Litigation, although the Liquidating Trust would not be added as a defendant until 1996,[53] it was paying litigation defense costs for Panex, Lazare, and Gal.[54]

Of course, by the time even the Rochester Button issue emerged in 1988, the Liquidating Trust had already distributed most of the funds in its possession, because the trustees were unaware that any liabilities existed that required retention of the funds.[55] The N.Y. Environmental Litigation started the Liquidating Trust's funding problem and the later emergence

of the VI Environmental Litigation compounded that problem. The Liquidating Trust simply did not have sufficient funds to mount an effective defense to the environmental claims. Furthermore, the Liquidating Trust was only three years away from the twelve-year deadline on its existence.

The funding issue came to the surface in 1994 when the Liquidating Trust filed an action in this court to "obtain a determination as to the proper distribution of the trust assets under Delaware law."[56] Specifically, the trustees were seeking approval to pay $600,000 to cover Panex, Lazare, and Gal's share of a settlement reached with certain plaintiffs in the VI Environmental Litigation.[57]

Various other parties to the VI Environmental Litigation, including the Virgin Islands Department of Education, which owned the Laga Facility, moved in that litigation to preliminarily enjoin the Liquidating Trust from proceeding with its petition in the Court of Chancery.[58] The moving parties were concerned that the payment of the settlement would exhaust the Liquidating Trust's assets.[59] The U.S. District Court for the Virgin Islands granted the requested injunction, and the Court of Chancery proceeding was suspended.

Those same parties later moved for a permanent injunction prohibiting the trustees of the Liquidating Trust from proceeding in the Court of Chancery to obtain

51. *Tutu Wells,* 994 F.Supp. at 666–75.

52. *New York v. Panex Indus., Inc.,* 1997 WL 627635 (W.D.N.Y.1997).

53. *See Tutu Wells,* 994 F.Supp. at 646.

54. *Tutu Wells,* 885 F.Supp. at 782.

55. *Id.* at 781.

56. *Id.* at 783.

57. *Tutu Wells,* 885 F.Supp. at 782–83; *see also In re Tutu Wells Contamination Litig.,* 157 F.R.D. 367, 372 (D.V.I.1994).

58. *Id.* at 372–73.

59. *Id.* at 373.

instructions regarding the disbursement of the Liquidating Trust's assets.[60] In April 1995, the U.S. District Court for the Virgin Islands granted the permanent stay and enjoined the Liquidating Trust and its trustees from disbursing its assets.[61]

By that time, the District Court had dismissed all the common law claims against Panex, Lazare, and Gal for reasons that bear quotation:

> In light of [Delaware General Corporation Law Section 278], this court must conclude that under Delaware law, the common law claims against Duplan, reincorporated as Panex, Industries, Inc., may not be maintained and must be dismissed.
>
> To the extent[ ] the complaints state claims against Lazare and Gal in their capacity as officers, directors, or stockholders of Duplan and Panex, Inc. [sic], these claims must also be dismissed under section 325(b) of the Delaware General Corporation Law.[62]

At that time, the U.S. District Court for the Virgin Islands, however, refused to dismiss the CERCLA claims because it found that CERCLA preempted the Delaware corporate dissolution and capacity statutes.[63]

By 1995, however, the U.S. Court of Appeals for the Third Circuit had issued a decision in *Witco Corp. v. Beekhuis* holding that CERCLA did not preempt state capacity statutes like § 325(b).[64] There-

fore, Panex, Lazare, and Gal renewed their request for dismissal of the CERCLA claims, arguing that the District Court's own logic in dismissing the common law claims now applied to the CERCLA claims as well.

The U.S. District Court for the Virgin Islands acknowledged that it could not rest its refusal to dismiss the CERCLA claims on the ground that CERCLA preempted §§ 278 and 325(b). But, it refused to extend its reasoning for dismissing the common law claims to the CERCLA claims, relying upon its interpretation of an intervening decision of the Delaware Supreme Court in *City Investing Co. Liquidating Trust v. Continental Casualty Co.*[65] The District Court read *City Investing* as standing for the broad proposition that the creation of a Liquidating Trust for any purpose has the effect of extending the winding-up period of the dissolving corporation for any potential liability that surfaces during the Trust's existence.[66] Under its reading, the District Court found that "because of the existence and activities of the Liquidating Trust, the predecessor corporation [i.e., Panex], has the attributes of a corporation in dissolution, with the capacity to sue and be sued."[67] Therefore, because under this view Panex was still in the winding-up period and it still had the capacity to sue and be sued, the District Court held that the CERCLA claims against Panex were not barred by

---

60. *See Tutu Wells,* 885 F.Supp. at 777–78.

61. *Id.* at 791–92.

62. *Tutu Wells,* 846 F.Supp. at 1280.

63. *Id.* at 1277; *see also In re Tutu Wells Contamination Litig.,* No. 95–7280, slip op. at 12–13, 74 F.3d 1228 (3d Cir.1995).

64. 38 F.3d 682 (3d Cir.1994).

65. *Tutu Wells,* 885 F.Supp. at 784–85 (citing *City Investing,* 624 A.2d 1191 (Del.1993)). Al-

though *City Investing* was not intervening in a purely temporal sense, it was intervening in a practical sense because it was decided only a few months before the District Court's prior decision dismissing the common law claims against Panex, Lazare and Gal and was not addressed in that decision.

66. *Id.* at 784.

67. *Id.*

DGCL § 278.[68] Relatedly, because Panex could still be sued, the District Court rejected Lazare and Gal's argument that because Panex's ability to be sued had expired, no judgment could be had against Panex and therefore claims against them for Panex's liabilities were barred by § 325(b).

Panex, Lazare, and Gal, in their capacity as former officers or directors of Panex, appealed. The Virgin Islands, which had still yet to sue over Laga, leapt into the appeal as an amicus against Panex, Lazare, and Gal.[69] It was unsuccessful in seeking to have the Third Circuit sustain the District Court's ruling.

In *In re Tutu Wells Contamination Litigation* ("*Tutu Wells*"),[70] the U.S. Court of Appeals for the Third Circuit reversed the District Court's decision, holding "that no judgment can be obtained against the dissolved corporations and therefore no claims can be maintained against their former officers or directors."[71] The Third Circuit's reason for dismissing the CERCLA claims was the same as the District Court's reason for dismissing the common law claims: 1) the dissolved corporations (Panex and its predecessors) lacked the capacity to be sued by operation of § 278 of the DGCL; and 2) therefore, the claims against the directors and officers of those dissolved corporations must be dismissed because § 325(b) requires a judgment against the corporation be obtained before a suit may be brought against any director

or officer.[72] In reaching its conclusion, the Third Circuit disagreed with the District Court's interpretation of *City Investing*. The Third Circuit found that although *City Investing* stood for the proposition that a liquidating "trust could be sued so long as it exists"—meaning that suits against the trust itself were not subject to the limitations period of § 278—the corollary to that proposition was that "the dissolved corporation cannot be sued whether or not the trust continues" because it lost capacity to sue or be sued at the end of the § 278 winding-up period.[73]

Because one of the considerations relevant to the issuance of an injunction is the effect the injunction will have on third parties, the Virgin Islands spent a section of its amicus brief to the Third Circuit arguing that the District Court's injunction precluding procession of the Chancery litigation seeking instructions as to the distribution of the Liquidating Trust would not prejudice the former stockholders of Panex.[74] That section of the brief presupposed that the parties seeking to hold Panex, Lazare, and Gal liable would prevail on the merits, which was necessary for the injunction below to be sustained.

Based on that presupposition, the Virgin Islands argued that there was no prejudice to former Panex stockholders because the trust fund doctrine supposedly rendered the former stockholders of Panex liable for debts of Panex, but only to the extent that they possessed assets that were "identifi-

68. *Id.*

69. The Virgin Islands filed an amicus brief supporting one of the appellees in the Third Circuit action because it was concerned that if the injunction were overturned and the Liquidating Trust was allowed to terminate, the Virgin Islands, as the current owner of the Laga Facility, could be held responsible for the contamination at the Laga Facility. Virgin Islands Brief to the Third Circuit at 32.

70. No. 95–7280, slip op., 74 F.3d 1228 (3d Cir.1995).

71. *Id.* at 17.

72. *Id.* at 15.

73. *Id.* at 14–15.

74. Virgin Islands Brief to the Third Circuit at 21–25.

able and traceable" to a distribution from Panex.[75] According to the Virgin Islands, "the creditors of [Panex] may retrieve th[o]se assets to satisfy the liabilities of Panex for environmental harm caused by the corporation's activities prior to dissolution."[76] In other words, because the stockholders would be on the hook for the Virgin Islands' environmental claims if the Liquidating Trust could not satisfy them, the former Panex stockholders were not prejudiced by preserving the Trust's (already inadequate) assets for use for that purpose. Likewise, because the Virgin Islands viewed applicable law as imposing a fiduciary obligation on the trustees of the Liquidating Trust toward "future contingent creditors" of the dissolved Panex, it argued that the injunction was not unfair to them.[77]

Hewing closely to its task, the Third Circuit eschewed addressing these arguments. Having found that the injunction had to be vacated because the claims against Panex, Lazare, and Gal had to be dismissed on the merits, the Third Circuit had no occasion to address the part of the equitable calculus relevant to the issuance of an injunction addressing the interests of third parties. Having lost on the merits, the Virgin Islands lacked the essential foundation for even calling upon the court's equitable powers. Moreover, the injunction below was not premised on any claim against a party in its capacity as a former Panex stockholder. Even as to Lazare and Gal, who were former Panex stockholders, the only claims on which the injunction rested were against them in their capacity as former directors and officers of Panex, not against them in their capacity as former stockholders. Thus, for these two independent reasons, the Third Circuit had no need to and therefore did not address the viability of any claims against former stockholders of Panex for liabilities of that dissolved corporation.[78]

### I. The Fate Of The N.Y. Environmental Litigation

Meanwhile, the U.S. District Court for the Western District of New York, unlike the Third Circuit, did have occasion to address the viability of trust fund doctrine claims against the former stockholders of Panex in the N.Y. Environmental Litigation. The defendants in the N.Y. Environmental Litigation included Lazare, Gal, Firmanco, and Goldman Sachs as former stockholder-distributees. In an October 1997 decision, Judge Elfvin granted the stockholder-distributees' motion to dismiss New York's trust fund doctrine claims against them.[79] In doing so, the District Court's reasoning was: "that the trust fund doctrine is inapplicable to a dissolved Delaware corporation subsequent to the three-year period provided in section 278 and that the State's action under CERCLA against the Panex Distributees is barred by section 325(b)."[80]

### J. The Establishment Of The Successor Trust

Under the Liquidating Trust Agreement by which the Liquidating Trust was formed, the Liquidating Trust had a maximum life span of twelve years, which would end on September 12, 1997. As that

---

75. *Id.* at 24.

76. *Id.*

77. *Id.*

78. *Tutu Wells*, No. 95–7280, slip op. at 16–17, 74 F.3d 1228.

79. *New York v. Panex Indus., Inc.,* 1997 WL 627635, at *3–4 (W.D.N.Y.1997).

80. *Id.* at *3.

deadline approached, the VI and N.Y. Environmental Litigations were still pending. The trustees of the Liquidating Trust were named personally as defendants in each of those suits.[81] The Trust itself had a rapidly shrinking pot of cash to use to defend claims and to seek out coverage from the dwindling Panex insurance policies that had been transferred to it.

Facing the deadline for the termination of the Liquidating Trust, the trustees petitioned the Court of Chancery in 1996 for an order authorizing them to terminate the Liquidating Trust.[82] Several parties, including the Virgin Islands, objected to the termination of the Liquidating Trust because they had unliquidated claims against the Liquidating Trust. The petition to terminate was warmly contested and eventuated in two oral arguments. The second of those oral arguments was held August 27, 1997—only two weeks before the absolute termination of the Liquidating Trust. By that time, the objecting parties' key objective was to seek to have the court create a successor trust to the Liquidating Trust.

The looming deadline put the court in a precarious situation and the court acted consistent with the flexibility and prudence characteristic of a court of equity. If the court terminated the Liquidating Trust, it risked precluding the objecting parties, such as the Virgin Islands, from being able to present claims against the Liquidating Trust based on the argument that the Trust was Panex's legal successor and liable for its debts. Likewise, the objecting parties had formulated the contention that the Liquidating Trust itself could assert claims for recoupment against recipients of distributions from it (and in a more strained argument, Panex) in order for the Trust to satisfy debts to claimants against it (such as New York and the Virgin Islands). If the Liquidating Trust was terminated, no judgment could be entered against it, and therefore recovery theories dependent on the entry of a judgment against it would be precluded. On the other hand, the court also faced the danger of hastily affirming the objectors' theories of recovery if it shaped an order that appeared to validate their view of the law. With its back against the wall as a result of the impending deadline for the termination of the Liquidating Trust, and having no rational time frame within which to address the competing views of the Trustees and the objectors regarding the extent to which distributees from the Trust and Panex could be held responsible at the late date of September 1997 for liabilities of the long-ago dissolved Panex, the court shaped an order that preserved the status quo as to the interested parties' rights.

The court accomplished that goal by establishing the Successor Panex Industries, Inc. Stockholders Liquidating Trust first by bench ruling on August 27, 1997 and later by Order dated September 30, 1997, as amended October 10, 1997.[83] The "Successor Trust Order" is very specific about what it did and did not do. The Successor Trust Order stated that "the Successor Panex Trust shall be established as the successor entity to the [Liquidating] Trust and Panex, Inc. and will succeed to and accept the assets, liabilities, rights, interests, and standing of the [Liquidating] Trust and Panex, Inc. *as of September 12, 1997.*"[84] Beyond accepting the assets, lia-

---

**81.** *See Tutu Wells,* 994 F.Supp. at 646; *New York v. Panex Indus., Inc.,* 1997 WL 627635 (W.D.N.Y.1997).

**82.** *Tutu Wells,* 994 F.Supp. at 648.

**83.** *See Rosenbloom,* 766 A.2d at 452.

**84.** Jameson Aff. Ex. 3 ("Successor Trust Order") at 3–4 (emphasis added).

bilities, and standing of Panex and the Liquidating Trust as of that date, the Successor Trust Order detailed several specific purposes and capacities of the Successor Trust, including two which are relevant to this case: (1) "to serve as the successor entity to the [Liquidating] Trust and Panex, Inc. in continuing to litigate, defend against, have judgment entered against it on, and/or settle claims brought against it by Petitioning Claimants in the [NY and VI] Environmental Litigations" and (2) "to investigate, evaluate and, if desirable, to institute, assert and/or settle litigation at the expense of and on behalf of the Successor Panex Trust for recoupment of distributions made by Panex, Inc. to its shareholders . . . and distributions made by the [Liquidating] Trust to the former stockholders of the then dissolved Panex, Inc."[85]

What is critical about the Successor Trust Order is that it took absolutely no position on whether viable claims existed as of September 12, 1997 against the Liquidating Trust, or by the Trust or any other party against distributees from the Liquidating Trust or Panex. It only vested in the Successor Trust whatever rights and responsibilities the Liquidating Trust had as of September 12, 1997 as to the N.Y. and VI Environmental Litigations—whatever they were, if any. Similarly, the Successor Trust Order did not determine that the Liquidating Trust had viable recoupment claims against distributees as of September 12, 1997, it simply vested in the Successor Trust whatever rights the Liqui-

dating Trust had, if any, to pursue such claims.[86]

Because the existing trustees of the Liquidating Trust were defendants in the N.Y. and VI Environmental Litigations and recipients of a significant portion of the liquidating distributions that might be subject to recoupment, the Successor Trust Order appointed an independent trustee, Michael DeBaecke (the "Successor Trustee"), and gave him the authority necessary to carry out the purposes of the Successor Trust.[87] This put DeBaecke in the difficult position of addressing the interests of two competing constituencies, the former Panex stockholders, who wished to put that ill-fated company out of mind forever, and the plaintiffs in the N.Y. and VI Environmental Litigations, who wished to obtain judgments holding those former stockholders, directors, and officers liable for Panex's activities at Rochester Button and Laga.

The Successor Trust Order was appealed by the remaining living trustee of the Liquidating Trust, Rosenbloom, as well as by the estate of Lazare, who had died in 1999.[88] The two issues on appeal were "whether the Court of Chancery acted within its authority in establishing a successor trust to succeed a liquidating trust which was about to expire on its own terms" and "whether it was an abuse of discretion to replace on the grounds of conflict of interest, the trustees of the liquidating trust upon creation of a successor trust when the trustees, who had received a substantial portion of the [liquidating distributions], had petitioned for in-

---

**85.** *Id.* at 4–5.

**86.** Judge Elfvin of the U.S. District Court for the Western District of New York recognized this. In his 1997 decision rejecting New York's argument that the Successor Trust Order established the viability of New York's trust fund claims against the Panex stockholder-distributees, he observed: "the September 30th Order makes no finding with respect to

the substance of the plaintiffs' claims against Panex, the [Liquidating] Trust or the Successor Trust." *New York v. Panex Indus., Inc.,* 1997 WL 805419, at *1 (W.D.N.Y.1997).

**87.** Successor Trust Order at 5, 12–13.

**88.** *Rosenbloom,* 766 A.2d at 453.

structions requesting termination of the trust which, if granted, would have denied a remedy to claimants, and avoided a possible recoupment action for the proceeds distributed."[89] The Delaware Supreme Court, sitting en banc, affirmed the Court of Chancery on both issues. The Supreme Court found that the "Court of Chancery clearly had the authority to extend the term of the trust in order to complete its purpose of"[90] discharging any "liabilities of the Trust or of Panex which the Trustees have reasonable grounds to believe may be asserted."[91] It went on to conclude that then-Vice Chancellor (now Chief Justice) Steele's decision to create a successor trust that had the benefit of "closing the door on other claimants" rather than just extending the existence of the Liquidating Trust was not in error because it did not "in any way compromis[e] the obligation of the successor trustee to defend" the Successor Trust against the claims by the existing claimants.[92] The Supreme Court also found that the Court of Chancery did not abuse its discretion by replacing the interested trustees with a disinterested trustee. In doing so, the Supreme Court determined that the Successor Trust Order did not establish the propriety of pursuing the potential recoupment claims:

Contrary to the Appellants' argument, the Vice Chancellor specifically and carefully refrained from deciding whether or not a recoupment or restitution action would be necessary or appropriate, leaving that for further analysis by the Successor Trustee. The fact that the Successor Trustee has initiated such an action does not mean that his effort is immune from review.[93]

Finally, finding that the issue was not properly before the Court, the Supreme Court rejected the former trustees' attempt to have it delve into the merits of the potential recoupment claims by determining whether § 325(b) of the DGCL barred recoupment claims against the former Panex stockholders.[94]

### K. The 1996 Federal Recoupment Claims And The 1998 NRD Action

In 1996, while the petition to terminate the Liquidating Trust was pending in the Court of Chancery, the CERCLA claims were dismissed against Panex and Lazare and Gal in their capacities as former directors and officers as required by the Third Circuit's *Tutu Wells* decision.[95] Combined with the earlier dismissal of the common law claims against these parties,

89. *Id.* at 452.

90. *Id.* at 458.

91. Trust Agreement ¶ 8.1.

92. *Rosenbloom,* 766 A.2d at 459.

93. *Id.* at 459–60. In dictum, the Supreme Court stated that "[b]y deciding to create a successor trust, the Vice Chancellor necessarily had concluded that the claims then pending must survive the termination of the Panex Trust." *Id.* at 459. This sentence is, as I interpret it, consistent with my interpretation of what the Successor Trust Order accomplished. That Order did not determine that any pending claim was viable, it only prevented any pending claim from being extinguished

by the end of the Liquidating Trust. As described, the Successor Trust Order was an exigent measure designed to address the imminent expiration of the Liquidating Trust's life and only gave the Successor Trust whatever rights and liabilities of Panex and the Liquidating Trust as of September 12, 1997. The Successor Trust Order makes no attempt to decide what those rights and liabilities were; in fact, it assigned the Successor Trustee the job of investigating and acting upon his own answers to those questions.

94. *Id.* at 462.

95. *Tutu Wells,* 994 F.Supp. at 645.

that dismissal left no pending claims against any of the parties related to Panex in the VI Environmental Litigation. As a result, the District Court allowed the oil companies to amend their third party complaints to assert claims against the remaining available parties related to Panex, including the Liquidating Trust, Lazare and Gal in their personal capacities, and Panex's primary stockholders—Lazare and Gal, Firmanco, and Goldman Sachs.[96] The Virgin Islands Department of Education joined in that amended complaint.[97] This was the first time that the Virgin Islands brought claims related to the contamination at the Laga Facility.

The Virgin Islands' complaint, in part, asserted "equitable disgorgement" claims against Panex's former stockholders.[98] Although not explicitly described as trust fund doctrine claims, the equitable disgorgement claims mimicked the trust fund doctrine: the claims asserted that Panex's former stockholders were liable as "distributees of the assets of Panex and/or the [Liquidating] Trust ... up to the amount of the distributions they ... received."[99]

Firmanco and Goldman Sachs contended that the U.S. District Court for the Virgin Islands did not have jurisdiction over them.[100] The Virgin Islands conceded that point and dismissed the equitable disgorgement claims against Firmanco and Goldman Sachs. The claims against the Liquidating Trust were dismissed because it had been replaced by the Successor Trust while the case was pending and the District Court concluded that its jurisdiction over the Liquidating Trust did not give it jurisdiction over the newly created Successor Trust.[101]

Lazare and Gal did not fare as well. The District Court found that factual issues precluded summary judgment on Lazare and Gal's personal liability under CERCLA.[102] It also refused to dismiss the claims against Lazare and Gal as former Panex stockholders after finding that the Panex stockholders assumed liability for Panex's environmental liabilities based on the liability warning language in the Panex liquidation Proxy Statement.[103] Lazare and Gal eventually settled all claims brought against them by the Virgin Islands.[104] But Lazare and Gal were differently situated than Goldman Sachs. As the principal managers of Panex and its predecessors who owned and managed the Laga Facility from 1968 to 1981, Lazare and Gal faced responsibility under CERCLA for their personal involvement in the polluting activities that allegedly occurred at the Laga Facility.

Once the 1996 recoupment claims against the Liquidating Trust had been dismissed, the Virgin Islands continued in its quest to hold Panex liable for the contamination at Laga. In September 1998, seven months after the dismissal of the claims against the Liquidating Trust, the Trustee for Natural Resources of the Virgin Islands filed a complaint in the U.S.

96. *Id.* at 646.

97. *Id.*

98. *Id.* at 656–57.

99. Bouchard Aff. Ex. D ("1996 Complaint") ¶¶ 76–77.

100. *Tutu Wells*, 994 F.Supp. at 651, 655.

101. *Id.* at 678.

102. *Id.* at 657, 664–75.

103. *Id.* at 675–77. In so holding, the District Court relied on precedent analyzing a liquidation agreement, but elided the fact that the Proxy Statement was a disclosure document rather than an actual liquidation agreement.

104. Tr. Of Oral Arg. On Def's Mot. To Dismiss (Sept. 27, 2007) at 82.

District Court for the Virgin Islands against the Successor Trust, Successor Trustee, Lazare, Gal, and several oil companies and businesses operating on St. Thomas, including Esso and Texaco (the "NRD Action" which is also included in the broadly defined "VI Environmental Litigation").[105] That complaint sought damages for injuries to the Virgin Islands' natural resources.

### L. The Successor Trustee Unsuccessfully Seeks Restitution From The Distributees Of The Liquidating Trust

In 1998, having investigated the recoupment claims as instructed in the Successor Trust Order, the Successor Trustee filed a petition in the Court of Chancery requesting a declaratory judgment that the Successor Trust was entitled to restitution of the monies distributed from the Liquidating Trust to its beneficiaries.[106] The petition did not allege that the distributees were bound to pay to the Trust the distributions they received from Panex itself, only the distributions they received from the Liquidating Trust after Panex dissolved.[107] In the alternative, the petition requested a declaratory judgment that the former trustees of the Liquidating Trust—Rosenbloom and Lazare—had breached their fiduciary duties by failing to obtain an express undertaking from the beneficia-

ries that they would return distributions from the Liquidating Trust if requested by the trustees to meet obligations of the Trust, and that therefore the former trustees were liable for the amount not returned by the distributees.[108] This petition was obviously supported by the Virgin Islands and New York, which assisted the Successor Trustee in crafting it.

In 2001, this court denied the petition for a declaratory judgment on restitution because the petition was procedurally defective and requested further briefing before ruling on the fiduciary duty claims.[109] A key procedural defect cited by the court was the failure of the Successor Trustee to join the distributees—that is, the former Panex stockholders—as parties, because the relief requested so directly affected their interests.[110]

### M. The Successor Trust's Lack Of Funds Causes It To Suffer A Default Judgment In The VI Environmental Litigation

After receiving this adverse ruling, the Successor Trustee did not attempt to cure the defects identified by this court by adding the former Panex stockholders as parties. Instead, the Successor Trustee soldiered on, trying to marshal resources to defend the N.Y. and VI Environmental Litigations. The former Panex stockhold-

---

**105.** Am. Compl. ¶ 43; Virgin Islands Ans. Br. at 6.

**106.** Bouchard Aff. Ex. E ("1998 Petition For Declaratory Judgment") at 1.

**107.** *Id.* at 15.

**108.** *Id.* at 1.

**109.** Then–Vice Chancellor (now Justice) Jacobs ruled that "the petition fails procedurally, and, therefore, will be dismissed, as far as the claims against the distributees are concerned." Tr. Of Oral Arg. On Mot. To Dismiss, Pet. For Decl. J., Mot. To Strike, and Ruling Of The Ct. (Aug. 14, 2001) at 131. He

also found that he was "not in a position to rule" on "the claims against the former trustees" and requested that those claims be "repackaged into a much more compact set of briefs." *Id.* at 132. The record in this case is unclear on whether those fiduciary duty claims were ever pursued.

**110.** *Id.* at 131–132 (noting that the petition for declaratory judgment was procedurally defective because it was not prosecuted in "the way a normal *in personam* lawsuit would proceed" and because it failed to join all the distributees).

ers were not volunteering to provide the Successor Trust with funds for that purpose. And insurance adequate to fund a defense of both actions was unavailable.

Despite the dearth of funds or insurance to cover litigation costs, the Virgin Islands continued to press its environmental claims against the Successor Trust in the VI Environmental Litigation. Penniless and facing the expensive task of defending claims based on conduct by Panex before 1981, the Successor Trustee had only one real option—default. In April 2005, the U.S. District Court for the Virgin Islands entered a default judgment for $51.6 million against the Successor Trust in the environmental litigation filed by the Virgin Islands.[111]

The Virgin Islands appears to have been fortunate to obtain a default judgment as opposed to having to litigate the merits of its claims. Otherwise, it would have faced questions about how it had owned the Laga facility since 1981 but did not itself discover the alleged contamination of its land and an important aquifer. Moreover, the Virgin Islands would have been forced to explain its own activities at the Laga Facility between 1981 and the discovery of the contamination in 1987. In his 1998 decision in the VI Environmental Litigation, Judge Brotman raised substantial concerns about the Virgin Islands' role in the contamination:

> [T]here is still some question as to whether the chemicals used at the Laga site during the time the plant operated were the sole cause of the contamination ascertained there by the EPA. The Court has already expressed concern over the existence of many 55-gallon drums behind what is now known as [the Virgin Islands Department of Edu-

cation's] Curriculum Center. While there is no way to state for certain, the existence of rotting drums of chemicals may be a factor in, and help explain, the contamination at the site. No appraisal report prepared in connection with the sale of the property mentions any drums, nor were any chemical drums listed on the inventory of items to be led [sic] on the site, suggesting that the Government may have placed them there after they acquired the property. There is also the allegation in need of ascertainment that [the Virgin Islands Department of Education] and other government agencies have used the open area behind the main building on the property to store drums containing paints, solvents, cleaners, roofing compounds, insecticides, floor wax, soap, strippers and disinfectants. According to one witness, one chemical drum had partially obscured lettering on it reading "V.I. Dept. Of Educ …," and other drums had on their exteriors names of companies with which [the Virgin Islands Department of Education] did business.[112]

Judge Brotman's concerns are supported by the Virgin Islands' less than fervent denial of its role in the contamination of the Laga Facility in its own brief to the Third Circuit:

> If the [Liquidating] Trust is allowed to liquidate, the Virgin Islands Government may be held liable for any contamination of the aquifer caused by Laga Industries, Ltd. … Contrary to those factual assertions made or implied by Appellants, there is evidence including eyewitness testimony that the improper disposal of wastes from the manufacturing processes utilized by Laga *may* have

---

111. Jameson Aff. Ex. 5 at 2.

112. *Tutu Wells,* 994 F.Supp. at 672–73 (internal citations omitted).

contaminated the property prior to the sale to the Virgin Islands Government.[113]

## N. *Requiem For A Successor Trust*

By early 2006, the untenable position of the Successor Trustee was obvious. He had no funds to defend claims against the Successor Trust. Nor did he have funds to pursue claims against the distributees of the Liquidating Trust.

Even worse, he continued to be caught between two conflicting sets of interests. New York and the Virgin Islands wanted the Successor Trust to exist as a vehicle against which they could obtain a judgment, so that they could then use that judgment as a basis for going after Panex's former stockholders. Meanwhile, the former Panex stockholders believed that the Successor Trustee had a fiduciary duty to protect them against those very claims, which the former stockholders believed to be stale and meritless.

In view of the reality that the existence of the Successor Trust was serving none of its original purposes, the court entered a stipulated order on February 9, 2006 terminating its existence. That order assigned to the Virgin Islands and New York whatever right the Successor Trust had to seek recoupment of the distributions made by Panex and the Liquidating Trust to Panex's former stockholders to the extent such claims would satisfy the judgments in the VI and N.Y. Environmental Litigations.[114] In all respects, the termination order was clear that this court was not deciding that the Successor Trust had rights in any respect. Rather, the termination order simply gave the appropriate constituencies the chance to prove that, as

to any category of possible rights assigned to them, that the Successor Trust possessed currently enforceable rights.

The recoupment rights given to New York would turn out not to be of any use. In early 2007, the U.S. Court of Appeals for the Second Circuit upheld the earlier decisions in the U.S. District Court for the Western District of New York dismissing New York's trust fund claims against the stockholder-distributees of Panex, agreeing with the District Court that §§ 278 and 325(b) of the DGCL barred those claims.[115]

## O. *After Further Delay, The Virgin Islands Re-files Its Long–Shelved Claims Against Goldman Sachs*

As has been mentioned, the Virgin Islands sued Goldman Sachs in the VI Environmental Litigation in 1996. In 1998, the Virgin Islands dismissed its claims against Goldman Sachs without prejudice. For over eight years, the Virgin Islands did not seek to reinstate its claims against Goldman Sachs. Even though the Virgin Islands was active in the litigation that remained pending in this court during the entire existence of the Successor Trust, it never sought to join Goldman Sachs as a defendant.

But eight months after the Successor Trust was terminated, on October 30, 2006, the Virgin Islands brought this suit against Goldman Sachs. In its complaint, the Virgin Islands asserted that it was bringing its suit in two capacities. The first capacity was as a creditor of the Successor Trust, seeking to collect on the default judgment it had obtained against the Successor Trust in the VI Environ-

---

**113.** Virgin Islands Brief to the Third Circuit at 32 (emphasis added).

**114.** Jameson Aff. Ex. 4 ("Successor Trust Termination Order") ¶ 1.

**115.** *Marsh v. Rosenbloom,* 499 F.3d 165, 184 (2d Cir.2007).

mental Litigation. The second capacity was as an assignee of the Successor Trust's right to seek recoupment against distributees from the Liquidating Trust and Panex.

The complaint is comprised of two formal counts. The first count alleges that Goldman Sachs will be unjustly enriched if it is permitted to keep the liquidating distributions it received in 1984 and 1985 from Panex, and in 1987 from the Liquidating Trust. This count is substantively identical to the theory the Virgin Islands used in the VI Environmental Litigation in 1996 when it first sued Goldman Sachs. Whether styled as an equitable disgorgement claim (the words used by the Virgin Islands in 1996) or an "unjust enrichment/trust fund doctrine claim"[116] (the words the Virgin Islands now prefers), the Virgin Islands' argument is identical to what it has always been. To wit, to the extent that Goldman Sachs received distributions from Panex or the Liquidating Trust, it is liable to return those distributions if a later-arising claimant obtained a judgment against a successor to those entities, regardless of when that judgment was obtained or when the claim on which that judgment was entered was first asserted.

The second count is based on a related theory. It argues that Goldman Sachs is estopped from denying its obligation to return the funds it received from Panex and the Liquidating Trust. The basis for this estoppel is that the Proxy Statement warned distributees that they "may be liable for any unpaid portion of [Panex's] liabilities to the extent of the liquidating

distributions paid to [them]" if the funds left in the possession of the Liquidating Trust were insufficient to discharge all of Panex's liabilities.[117]

## II. *Procedural Framework*

■■■ Goldman Sachs has moved to dismiss the complaint for failure to state a claim upon which relief may be granted. When addressing a motion to dismiss under Court of Chancery Rule 12(b)(6), I must assume the truthfulness of all well-pled facts in the complaint and draw all reasonable inferences in the light most favorable to the nonmoving party, the Virgin Islands.[118] But conclusory allegations that are unsupported by facts contained in the amended complaint will not be accepted as true.[119] After evaluating the amended complaint in this manner, I must dismiss the complaint if the Virgin Islands would not be entitled to recover under any reasonable set of facts properly supported by the complaint.[120]

## III. *Legal Analysis*

Goldman Sachs' motion to dismiss puts forth five primary arguments that it believes support dismissal of the Virgin Islands' complaint. The first two arguments are related, in the sense that both turn on the assertion that §§ 278 and 325(b) of the DGCL bar the claims asserted by the Virgin Islands. The first of these arguments, however, contends that I need not examine what effect those statutory provisions have on the Virgin Islands' claims because the Third Circuit's *Tutu Wells* decision has already done so. That is, Goldman Sachs

---

116. Virgin Islands Ans. Br. at 21.

117. Proxy Statement at 6.

118. *E.g., In re General Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006) (quoting *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896–97 (Del.2002)).

119. *E.g., Hughes,* 897 A.2d at 168 (quoting *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 65–66 (Del.1995)).

120. *E.g., Hughes,* 897 A.2d at 168 (quoting *Savor,* 812 A.2d at 896–97).

contends that the Third Circuit has already held, in a proceeding in which the Virgin Islands had an opportunity to contest the issue, that it cannot bring claims against Panex, per § 278, and that therefore § 325(b) bars claims against Goldman Sachs, as a former stockholder of Panex.

Secondarily, Goldman Sachs argues that even if the Third Circuit's decision is not preclusive on this issue, its reasoning, and the similar reasoning adopted by the U.S. District Court for the Western District of New York and the Second Circuit in rejecting New York's analogous claims, was sound and supports a holding that the combined effect of §§ 278 and 325(b) of the DGCL is to bar the Virgin Islands' claims. The third category of argument is similar and rests on the notion that, just as §§ 278 and 325(b) bar the Virgin Islands' claims regarding the distributions Goldman Sachs received from Panex, so too do the specific terms of the Liquidating Trust Agreement bar the Virgin Islands' claim that Goldman Sachs must return the funds it received from that Trust. The fourth category addresses the Virgin Islands' contention that Goldman Sachs is estopped from denying the Successor Trust's request for a return of the liquidating distributions from Panex and the Liquidating Trust. Finally, Goldman Sachs argues that, irrespective of the merits, the Virgin Islands' torpidity in pressing its claims constitutes laches.

The Virgin Islands' response to the arguments that its underlying claims lack merit and are barred by laches is predictable: it denies the force of all of Goldman Sachs' arguments. The Virgin Islands' response to the allegation that §§ 278 and 325(b) of the DGCL bar its claims, however, is complex and dependent on its chameleon-like role in this litigation.[121] The

Virgin Islands, it must be remembered, purports to bring claims in two separate capacities. One capacity is as a CERCLA claimant and now, by virtue of the default judgment, as a judgment-creditor. The other capacity is as an assignee of whatever recoupment rights the Successor Trust had.

In its capacity as a judgment-creditor, the Virgin Islands asserts that its claims are not barred by § 278 because I should adopt a version of the trust fund doctrine, in a way that is unprecedented in Delaware. The Virgin Islands claims that the trust fund doctrine is unaffected by § 278 and § 325(b) and that it allows creditors of a dissolved corporation, even those who first bring their claims after the statutory winding-up period has ended, to recoup assets of the dissolved corporation from its former stockholders. Alternatively, the Virgin Islands, also in its capacity as judgment-creditor, alleges that an extension of the reasoning in *City Investing* supports the proposition that because the Liquidating Trust was in existence as of the time the Virgin Islands brought suit in 1996— albeit only for purposes entirely unrelated to the Virgin Islands' claim—a judgment entered against that Trust may be used as a vehicle to demand that distributees of the Liquidating Trust return distributions they received from Panex and the Trust, even though the Virgin Islands did not assert a claim until after the Liquidating Trust's existence as a general successor to Panex for liability purposes had ended.

In its distinct capacity as an assignee of the rights of the Successor Trust, the Virgin Islands argues that § 278 does not bar its claims because § 278 only applies to suits by or against the corporation and § 325(b) does not apply because it only

---

**121.** At one point in its brief, the Virgin Islands says that § 278 does not apply because

the Successor Trust is suing itself. Virgin Islands Ans. Br. at 28.

applies to suits by a creditor for a debt of the dissolved corporation. The Virgin Islands would have this court ignore §§ 278 and 325(b) because Panex no longer existed and the Virgin Islands obtained a judgment against the Successor Trust. But it would also, in a self-serving example of inconsistency, have me ignore that Goldman Sachs received most of its distributions in its capacity as a Panex stockholder, a much smaller sum as a beneficiary of the Liquidating Trust, and no distributions from the Successor Trust.

I cannot and do not ignore the important issue of the capacity in which Goldman Sachs received the distributions at issue. Goldman Sachs faces potential liability in two distinct capacities, as a former stockholder distributee of Panex and as a beneficiary distributee of the Liquidating Trust. The legal basis for determining whether Goldman Sachs is liable is somewhat distinct for each capacity.

In an attempt to create some semblance of order and clarity, I address the issues as follows. First, I decide what issues, if any, are precluded by the Third Circuit's *Tutu Wells* decision. Second, I address the issue of whether the Virgin Islands has a claim against Goldman Sachs irrespective of the creation of the Liquidating and Successor Trusts. Third, I decide whether the Virgin Islands has a claim against Goldman Sachs because of the existence of the Liquidating and Successor Trusts. Fourth, I take up the Virgin Islands' estoppel claims. Finally, I discuss the defense of laches in reference to all the Virgin Islands' claims.

A. *Which, If Any, Of The Virgin Islands' Arguments Are Precluded By The Third Circuit's Tutu Wells Decision?*

■■■ Issue preclusion, also known as collateral estoppel,[122] "precludes a party to a second suit involving a different claim or cause of action from the first from relitigating an issue necessarily decided in a first action involving a party to the first case."[123] The doctrine of issue preclusion is commonly used by defendants seeking to prevent plaintiffs from asserting claims.[124] "[T]he preclusive effect of a foreign judgment is measured by standards [used by] the rendering forum."[125] Goldman Sachs grounds its argument for issue preclusion on the *Tutu Wells* decision of the U.S. Court of Appeals for the Third Circuit, and thus it must establish that the following elements of issue preclusion have been met: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action."[126] The Third Circuit's issue preclusion jurisprudence also requires consideration of "whether the party being precluded had a full and fair opportunity to litigate the issue in question in the prior action and whether the issue was determined by a final and valid judgment."[127]

The Third Circuit in *Tutu Wells* held that § 278 rendered Panex "without [the]

---

122. *E.g., Hendry v. Hendry,* 2006 WL 1565254, at *8 n. 77 (Del.Ch.2006).

123. *One Virginia Ave. Condo. Ass'n of Owners v. Reed,* 2005 WL 1924195, at *10 (Del.Ch. 2005).

124. *E.g., Nicholson v. Redman,* 620 A.2d 858, 1993 WL 22026, at *1 (Del.1993) (TABLE).

125. *Columbia Cas. Co. v. Playtex FP, Inc.,* 584 A.2d 1214, 1217 (Del.1991).

126. *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.,* 458 F.3d 244, 249 (3d Cir.2006) (internal quotation and citation omitted).

127. *Id.* (internal quotation and citation omitted).

capacity to be sued well before [the VI Environmental Litigation] was commenced."[128] The court found that § 278 of the DGCL "provides that dissolved corporations may sue and be sued for a period of three years from the date of dissolution."[129] Thus, "any suit brought after that period must be dismissed for lack of capacity."[130] After finding that Panex dissolved in 1985 and the VI Environmental Litigation was not commenced until 1989, with Panex not being joined as third-party defendants in the litigation until 1992, the court held that Panex lacked the capacity to be sued and that the CERCLA claims against Panex must be dismissed.[131] The Third Circuit rejected the argument, based on *City Investing*, that the existence of the Liquidating Trust gave Panex itself the capacity to be sued. The court concluded that the *City Investing* decision only suggested that the Liquidating Trust could be sued directly in accordance with the terms creating it,[132] not that the existence of the Liquidating Trust extended the existence of Panex.[133]

The Third Circuit went on to find that the "claims against Gal and Lazare in their capacities as former officers and directors of the dissolved corporations must ... be dismissed because no judgment may be obtained against the former corporations."[134] This conclusion was based on § 325(b) of the DGCL, which the court determined required the return of an unsatisfied judgment against the corporation before suit could be brought against any officer or director for any debt of the corporation.[135]

■ The Third Circuit had no occasion to address the question of whether this same reasoning applied to protect former stockholders of Panex. The reason for that was that Lazare and Gal were only before the Third Circuit "in their capacities as former officers or directors of Laga, Duplan and Panex."[136] Thus, the Third Circuit's holding only addressed Lazare and Gal's liability as former officers or directors of Panex and its predecessors: "We will reverse the injunction and remand with instructions ... to dismiss Gal and Lazare, in their capacities as former officers and directors ... on the ground that no judgment can be obtained against the dissolved corporations and therefore no claims can be maintained against their former officers or directors."[137]

---

128. No. 95–7280, slip op. at 15, 74 F.3d 1228.

129. *Id.* at 9, 15 (describing the lower court's findings in *Tutu Wells*, 846 F.Supp. 1243, which it would adopt in making its ruling).

130. *Id.*

131. *Id.*

132. The Third Circuit noted that under *City Investing*, a "trust may be sued so long as it exists" in order to discharge the liabilities vested in it under the "trust agreement." *Id.* at 14. In *City Investing*, the Third Circuit realized, the trust at issue was vested with all liabilities of the predecessor corporation. *Id.* In this case, the Liquidating Trust of Panex was vested with all liabilities of Panex for a period ending three years after the date of the

Trust Agreement—September 12, 1988—and after that, with only certain discrete liabilities, not including the Virgin Islands' claims at issue here.

133. *Id.* at 15 ("The *City Investing* case stands, as well, for the proposition that the dissolved corporation cannot be sued whether or not the trust continues.").

134. *Id.*

135. *Id.* at 9–10, 15; *see also Tutu Wells*, 846 F.Supp. at 1280.

136. *Tutu Wells*, No. 95–7280, slip op. at 3, 74 F.3d 1228.

137. *Id.* at 17.

As noted previously,[138] the Third Circuit expressly avoided opining on certain issues briefed by the Virgin Islands, which touched on the extent to which the former Panex stockholders might be liable to return the distributions they received if the Virgin Islands proved that Panex's operations at Laga caused environmental damage.[139] These arguments related only to the question of whether the injunction, if sustained by an adequate merits showing, was unfair to parties not before the court. Because the Virgin Islands' claims against Lazare and Gal in their capacity as directors and officers were rejected on the merits, the Third Circuit did not reach the collateral arguments relating to Panex's former stockholders.

■ And because the Third Circuit did not issue a determination as to the effect of § 325(b) on claims against former Panex stockholders, the *Tutu Wells* decision cannot have any preclusive effect on that precise issue.[140] It does, however, have a preclusive effect as to the narrower, and less controversial, issue of whether a judgment can be obtained against Panex. As to that narrow issue, the Virgin Islands had its turn at bat and swung and missed. The holding of the Third Circuit that Panex's ability to be sued expired three years after its dissolution, per the clear and unambiguous words of § 278, is binding against the Virgin Islands.

In holding that the Third Circuit's *Tutu Wells* decision is not preclusive as to the issue of the former Panex stockholders'

liability to the Virgin Islands, I reject Goldman Sachs' novel "a fortiori" theory of issue preclusion. Admitting of the reality that the Third Circuit only addressed the claims against Lazare and Gal in their capacities as former Panex officers and directors, Goldman Sachs argues that *Tutu Wells* nevertheless precludes the Virgin Islands' claims against former Panex stockholders. Goldman Sachs notes that the "plain language of Section 325(b) leaves no doubt that it applies equally to officers, directors and stockholders" and that "[i]f officers and directors—those who managed the enterprise—are insulated from personal suit by Delaware law, then, *a fortiori,* so too are passive stockholders like Goldman Sachs." [141] This argument ignores the requirement that issue preclusion only applies when the issues are identical,[142] and that there is no doctrine of *a fortiori* issue preclusion. Rather, this type of argument is really one calling on a later court to recognize and give important precedential effect to the reasoning of a prior court because that reasoning is arguably both sound and fully applicable to the different, but analytically indistinct, issue the later court faces.

■ This case actually illustrates why that is so. The claims presented in *Tutu Wells* against Lazare and Gal as former directors and officers are arguably different as a policy matter than the claims presented here against a former stockholder. The claims in *Tutu Wells* were based on Lazare and Gal's status as directors and officers. The claims presented in this

---

138. *See supra* notes 74–78 and accompanying text.

139. *Tutu Wells,* No. 95–7280, slip op. at 16, 74 F.3d 1228.

140. Issue preclusion does not bar the litigation of issues upon which a prior court purposefully reserved judgment. *E.g., In re PCH Assocs.,* 949 F.2d 585, 593 (2d Cir.1991).

141. Goldman Sachs Rep. Br. at 5.

142. 18 James Wm. Moore et al., Moore's Federal Practice § 132.02[2][a] (2006) ("The doctrine of issue preclusion only applies when the issues presented in each matter are identical.").

case are premised on the stockholders' (allegedly inequitable) receipt of distributions from Panex and the Liquidating Trust. Although Goldman Sachs says that it is clear that a former director or officer should be more exposed to post-dissolution liability than passive stockholders, the grounds for holding these corporate constituencies responsible or not are likely to be different. In the case of former stockholders, the issue is really one of underlying fairness: should former stockholders be subject to a restitutionary kind of remedy if they, through no fault of their own, received distributions and the funds left in the corporate coffers turn out to be inadequate to cover a later-arising claim? It may well be that §§ 278 and 325(b) provide a uniform answer for claims against directors, officers, and stockholders. But I must come to that determination freshly, not by pretending that the Third Circuit already made that determination.[143]

B. *Does The Virgin Islands Have A Claim Against Goldman Sachs Irrespective Of The Creation Of The Liquidating And Successor Trusts?*

For the sake of analytical clarity, it is useful to begin the analysis of the merits with a consideration of whether the Virgin Islands has viable claims against Goldman Sachs, irrespective of the creation of the Liquidating and Successor Trusts. In other words, would Goldman Sachs be on the hook for the distributions it received from Panex in 1984 and 1985 before Panex dissolved even though the Virgin Islands did not assert environmental claims related to Panex's Laga operations until 1996, many years after Panex's three-year post-dissolution existence under § 278 expired? After answering this isolated question, I will then address the implications of the Liquidating and Successor Trusts.

In embarking upon answering this initial question, I begin by noting one obvious point, a point the Virgin Islands is precluded from relitigating. By its plain terms, § 278 of the DGCL made clear that Panex's existence and ability to be sued or to bring suit as to claims that were not yet in existence terminated on April 15, 1988, three years from the date of its dissolution. *Tutu Wells* so held, and the statutory language admits of no other reading.

■ The key question then becomes whether §§ 278 and 325(b)'s terms pre-

---

**143.** Goldman Sachs also asserts that the doctrine of claim preclusion bars the Virgin Islands' claims. I find this argument difficult to fathom. As discussed above, the Third Circuit did not address the issue at the heart of this case—whether a former stockholder of Panex might be liable to return the distributions it received if the Virgin Islands proved that Panex's operations at Laga caused environmental damage. Moreover, a key element of claim preclusion is that the presently suing party had an opportunity to bring its current claims against its adversary in a prior action and failed to do so, rendering the judgment in that prior action conclusive as to all claims that could have been litigated in the prior action. *E.g., Churchill v. Star Enters.*, 183 F.3d 184, 194 (3d Cir.1999) ("Claim preclusion gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding.") (internal quotation and citation omitted). Goldman Sachs was not a party to the VI Environmental Litigation at the time of the Third Circuit decision. Although Goldman Sachs was later added as a party, it was dismissed as a party without prejudice after it asserted that personal jurisdiction over it did not exist in the U.S. District Court for the Virgin Islands. Therefore, Goldman Sachs cannot claim that the final judgment in the VI Environmental Litigation, if there be one, precludes the claims the Virgin Islands is now bringing. *E.g., Saudi v. Acomarit Mar. Servs., S.A.*, 114 Fed.Appx. 449, 454 (3d Cir. 2004) (finding that claim preclusion did not apply to a dismissal without prejudice for lack of personal jurisdiction because the dismissal was neither on the merits nor a final judgment).

clude the Virgin Island's claims against Goldman Sachs. It is here that the Virgin Islands resorts to its argument that I should find, as a matter of common law making, that a variant of the ill-defined trust fund concept permits suit against Goldman Sachs, despite the plain language of §§ 278 and 325(b). A court asked to make common law in an area addressed by legislative enactments should proceed with great caution, and the statutory language of § 325(b) is itself a powerful reminder of that need. Section 325(b) plainly states that "[n]o suit shall be brought against any ... stockholder for any debt of a corporation of which he is a[ ] ... stockholder, until judgment be obtained therefor against the corporation and execution thereon be returned unsatisfied."[144]

■ Taking the General Assembly's words literally, as one should if they express, as they do here, a rational purpose, § 325(b) clearly bars the Virgin Islands from seeking to hold Goldman Sachs, as a former Panex stockholder, responsible for a debt, such as its liability on claims relating to its allegedly environmentally irresponsible conduct at Laga, unless the Virgin Islands first obtained a judgment against Panex. Because Panex's ability to be sued and therefore subjected to a judgment by the Virgin Islands expired in 1988 per the clear terms of § 278, before the Virgin Islands asserted claims, § 325(b) bars the Virgin Islands' claims.

The Virgin Islands would have me ignore the clear import of the statutory regime, by reference to public policy considerations that it contends justify overriding §§ 278 and 325(b) through judicial lawmaking. That judicial lawmaking, in the Virgin Islands' hopes, would involve the recognition of an open-ended obligation on the part of stockholders of dissolved corporations to return distributions they had received from the dissolved corporation whenever a post-dissolution claimant can prove that the corporation owed it funds based on its pre-dissolution activities. As thus conceived, this variant of the trust fund doctrine would impose a trust on the funds received by stockholders from a dissolving corporation, for the benefit not only of creditors that the directors of the dissolving corporation knew about or had reason to suspect existed during the dissolution process, but also as to any unsuspected future claimants.

Like many other courts who have addressed this issue, I conclude that the legislature's enactments preclude the room for judicial invention. The obvious intent of § 278 as of the relevant time was to establish a three-year period during which claims against a dissolved corporation could be brought. After that period expired, the only judgments that could be entered against the dissolved corporation were for claims that were brought before that period expired. The intention of the statute was therefore to balance the competing public policy interests of ensuring that claimants against the corporation had a time period in which to assert claims against the dissolved corporation and ensuring that directors, officers, and stockholders of a dissolved corporation could have repose from claims regarding the dissolved corporation. The latter concern is not a trivial one. If, as it seems obvious, Delaware has an interest in fostering capital investments in its corporations, providing former stockholders of dissolved corporations with a temporal limitation on their exposure to claims against them based on corporate debts is a clearly rational way to advance that interest. Sections 278 and 325(b), when read in concert, achieve that objective in a measured way.

In determining that winding-up provisions like § 278 preclude stockholder lia-

144. 8 *Del. C.* § 325(b).

bility under a common law trust fund theory, I join the majority of courts and commentators who have addressed the question of whether the adoption of corporate dissolution statutes supplanted the trust fund doctrine.[145] As to this point, I also agree fully with Goldman Sachs that the Third Circuit's *Tutu Wells* decision logically supports the conclusion I now reach as to the combined effect of §§ 278 and 325(b), because its reading of the words of the statutes has as much application to claims against stockholders, as against officers and directors.

My reading of § 278 is also consistent with the well-reasoned decision of the Second Circuit in rejecting New York's trust fund claims against Panex's former stockholders, including Goldman Sachs. As a policy matter, New York was in a stronger position than the Virgin Islands to have the court afford it a trust fund remedy against Goldman Sachs because New York had at least sent Panex a notice of its claims before the three-year extension period under § 278 expired although Panex did not receive that notice until shortly after the period had expired. Even though New York had attempted to raise its claims in a timely way, the Second Circuit rejected New York's argument that its trust fund claim against Panex's former stockholders should be recognized as consistent with §§ 278 and 325(b). The Second Circuit held, as I now conclude, that statutes such as § 278 set forth a period during which post-dissolution claims can be made and after which stockholders should have repose, stating: "We are persuaded by the general consensus that modern statutory remedies have effectively replaced the trust fund doctrine and that there are sound reasons for abiding by the wind-up period established by section 278."[146]

Even if I were to adopt a variant of the trust fund doctrine as an exception to

145. *See, e.g.,* 15A WILLIAM M. FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 7373 (2006) ("[T]he adoption of corporate dissolution statutes has supplanted the equitable trust fund theory in most jurisdictions."); Mark J. Roe, *Mergers, Acquisitions and Tort: A Comment on the Problem of Successor Corporation Liability,* 70 VA. L.REV. 1559, 1564 n. 15 (1984) ("[T]he trust fund theory has been largely displaced by corporate law statutory provisions for remedies subsequent to dissolution, however, incomplete those statutory remedies may be."). Numerous state courts have addressed the interaction of corporate dissolution statutes and the trust fund doctrine and concluded that the corporate dissolution statutes supersede the trust fund doctrine. *See, e.g., Pacific Scene, Inc. v. Penasquitos Inc.,* 46 Cal.3d 407, 250 Cal.Rptr. 651, 758 P.2d 1182, 1189 (1988) ("[W]e conclude that the Legislature has precluded the assertion of postdissolution claims against the former shareholders of a dissolved corporation under the equitable 'trust fund' theory."); *Hunter v. Fort Worth Capital Corp.,* 620 S.W.2d 547, 550 (Tex.1981); ("The effect of these [corporate dissolution] statutes was to supplant the equitable trust fund the-ory by declaring a statutory equivalent."); *Blankenship v. Demmler Mfg. Co.,* 89 Ill. App.3d 569, 44 Ill.Dec. 787, 411 N.E.2d 1153, 1156 (1980) ("We agree with defendant that extension of the trust fund theory to cover plaintiff's claim would mean that the corporation could never completely dissolve but would live on indefinitely through its shareholders. We do not believe that this result would be in accordance with the spirit of the laws governing the dissolution of corporations.").

146. *Marsh,* 499 F.3d at 176. In this regard, it is also notable that the primary case that the Virgin Islands cites as supporting the survival of the trust fund doctrine after the enactment of statutory corporate dissolution statutes instead supports the conclusion that §§ 278 and 325(b) bar the use of the trust fund doctrine for claims arising more than three years after dissolution. In *Green v. Oilwell,* the Supreme Court of Oklahoma found that the Oklahoma legislature did not displace the trust fund doctrine by enacting a corporate dissolution statute that extended the existence of a corporation for the purposes of prosecuting and

§§ 278 and 325(b), I cannot imagine that it would be of the sort necessary to aid the Virgin Islands. The complaint does not allege that the fiduciaries charged with dissolving Panex were on notice before 1992 of any potential claims relating to the Laga Facility. As of the expiration of the three-year period under § 278, the Virgin Islands had owned Laga for over seven years and never alleged that Panex had been environmentally irresponsible in its operations at the site.

To the extent that there is a sound basis for the trust fund doctrine, it is to address the potential for opportunism that exists when a corporation is winding-up its affairs or has become insolvent. In those circumstances, the corporation is unlikely to be able to generate future revenues to address creditor claims. Therefore, if it distributes its remaining assets to its stockholders without accounting for those claims, creditors could be stiffed and the stockholders could get a windfall, something akin to an illegal dividend. Indeed, it is precisely for this reason that many trust fund cases have the feel of fraudulent conveyance about them, as they involve situations when those winding-up the corporation's affairs were seeking to evade claims that were extant or feared.[147] In fact, the decision of Justice Story, then sitting as a Circuit Justice, that is commonly thought of as giving birth to the trust fund doctrine, involved just such a fact pattern.[148]

defending actions by or against it without providing for a winding-up period during which post-dissolution claims could be filed against the dissolved corporation. 767 P.2d 1348, 1351–52 (Okla.1989). The court distinguished the numerous cases from other jurisdictions that held that statutory corporate dissolution statutes superseded the trust fund doctrine by observing that unlike the other jurisdictions, Oklahoma's statutory scheme "did not provide creditors a direct statutory remedy ... regardless of when the claim accrued" and that "a creditor's only direct remedy against a former shareholder of a dissolved corporation to recover assets received upon dissolution is in equity under the trust fund theory." *Id.* at 1352. Although the court focused its analysis on the non-existence of a direct statutory remedy for stockholders, a careful reading of the case indicates that the court's true concern was that the Oklahoma statute did not provide any redress for post-dissolution claims. Specifically, the court saw "no rational reason to differentiate between pre-dissolution and post-dissolution claims" and found that denying a product liability claim for an incident that occurred two weeks after dissolution and upon which a suit was filed within two years, a "reasonable time after ... dissolution," would be "arbitrary and untenable." *Id.* at 1354. The critical difference between the statute at issue in *Green* and § 278 of the DGCL is that the Oklahoma legislature, unlike the Delaware General Assembly, intended for its statute to address only pre-dissolution claims. In fact, during the time the *Green* case was pending, the Oklahoma legislature passed a new General Corporation Act with sections almost identical to §§ 278 and 325(b). This prompted the court to observe that the trust fund theory would likely be limited to three years under the new statutory scheme:

> Because under 18 O.S. Supp.1986 § 1124(B) of the new General Corporation Act no suit may be brought against a shareholder for a debt of the corporation until judgment is obtained against the corporation and under § 1099 of the new Act a suit against a dissolved corporation must be commenced within three years after dissolution, it would appear the equitable trust fund theory against a former shareholder would likewise be subject to the three year statute of limitations under the new Act. *Id.* at 1353 n. 9.

147. *E.g., Snyder v. Nathan*, 353 F.2d 3, 4 (7th Cir.1965) (invoking the trust fund doctrine when a dissolving corporation paid out substantially all of its assets to its stockholders despite the knowledge of a pending claim); *Gaskins v. Bonfils*, 79 F.2d 352, 355 (10th Cir.1935) (same).

148. Justice Story is credited with inventing the trust fund doctrine in the 1824 case *Wood*

If the trust fund doctrine were as uncabined as the Virgin Islands would have it, stockholders of American corporations would live in constant fear. A multitude of formerly dividend-paying corporations have dissolved or gone bankrupt over the years. Many of these corporations did so in part because their profit-generating operations involved the manufacture of products—think asbestos—that gave rise to later liability claims. Under the Virgin Islands' theory, all of the stockholders who received dividends as a result of the sales of asbestos and other claims-generating products should be forever on the hook to return those dividends. The same would be true of stockholders who received dividends and whose corporations were later unable to pay off contract creditors whose rights preceded the payment of the dividends.

If, as seems probable, the public interest in promoting economic growth would be impaired by exposing equity investors to perpetual risk of this kind, a container of some kind on the trust fund doctrine would have to be built. In sizing that container, judicial recognition would have to be given to § 278's tempering of the common law doctrine of abatement, which held that the dissolution of a corporation immediately ended its legal existence and terminated its capacity to sue and be sued.[149] Statutes such as § 278 mitigated that harshness by continuing the legal existence of a dissolved corporation for a wind-up period during which claims can be asserted. These statutes also ensured that "any suit against the corporation, which was filed before the dissolution or during the three-year statutory wind-up period, does not abate, even on the expiration of the wind-up period."[150]

Not only is that tempering relevant to my conclusion that no space exists for judicial invention here, it would also be relevant if I concluded that there was room for a trust fund doctrine of some kind. Because the General Assembly would have already created a three-year period during which stockholders would be at risk—a period that could be extended for claims arising and still pending as of the end of that period—the protective necessity for any trust fund doctrine would be narrowed by that important statutory effect. Indeed, because the three-year period must be read as resting on a policy basis and that policy basis is most obviously that that was the General Assembly's belief as to a fair period to give claimants during which to either raise claims or lose them, the most logical room for a trust fund doctrine to operate would be to address some type of interstitial abuse of the dissolution process not captured by § 278's literal terms. One could conceive, I suppose, of a situation where those handling the funds of a dissolved corporation assured a creditor it would pay off her bill as the § 278 deadline approached and urged her not to file a collection action. Then they cause the corporation to make a distribution of all its funds to its stockholders

---

v. Dummer, 30 F.Cas. 435 (C.C.D.Me. 1824)(No. 17,944). In that case, Justice Story created the doctrine to address the inequity created by stockholders of a dissolving bank voting to distribute a large portion of the bank's paid-in capital to themselves without adequately providing for known debts of the bank. Id. at 436–37.

149. In re RegO Co., 623 A.2d 92, 95 (Del.Ch. 1992); see also Ann E. Conaway Stilson, Reexamining The Fiduciary Paradigm at Corporate Insolvency and Dissolution: Defining Directors' Duties to Creditors, 20 DEL. J. CORP. L. 1, 67 (describing the enactment of dissolution statutes in response to the common law of abatement).

150. RegO, 623 A.2d at 95.

as the § 278 deadline is reached without paying off the creditor.

The recognition of a trust fund claim against the recipient stockholders in that context would, however, have its roots in the kind of inequity that gave rise to the trust fund doctrine in the first instance.[151] That is, it would involve the payment to stockholders of a distribution in the face of an unsatisfied creditor claim. Even in that circumstance, one can think of non-statutory arguments for limiting the exposure of innocent stockholders to claims, and limiting the duped creditor to bringing claims against the crafty fiduciaries who tricked her.

What I find unfathomable is the notion that this state would adopt, as part of its common law of equity, a trust fund doctrine that puts stockholders receiving distributions from a dissolving corporation at risk of liability when the creditor-plaintiff made no demand of any type on the dissolving corporation and the dissolving corporation's directors had no reason to believe such a demand would be made before the expiration of the extra three-year period established by § 278. In that circumstance, not only the recipient stockholders, but the directors authorizing the distribution could not be said to have acted in subjective bad faith toward anyone.

In concluding that it would be imprudent to recognize such a cause of action against stockholder-recipients, I am not unmindful of the externalities that are often generated by profit-making entities or the opportunities the dissolution process presents for abuse.[152] But those concerns

---

**151.** I admit that certain commentators have advocated a version of the trust fund doctrine that bears little or no resemblance to the anti-fraud rationale that motivated Justice Story's *Wood v. Dummer* decision and its progeny. These commentaries appear to reflect the view that the common law ought to hold stockholder-distributees strictly liable to restore distributions received from corporations that have committed torts, regardless of whether the dissolution process was conducted entirely in good faith. *See, e.g.,* James Boyd & Daniel E. Ingberman, *Fly by Night or Face the Music? Premature Dissolution and the Desirability of Extended Liability,* 5 AM. L. & ECON. REV. 189, 224 (2003) ("Extending liability to business partners, making shareholder liability unlimited, and allowing liability to follow shareholders postdissolution are all ways to foster greater cost internalization and the welfare benefits that spring from it. They are not without costs of their own, however."); Michael D. Green, *Successors and CERCLA: The Imperfect Analogy to Products Liability and an Alternative Proposal,* 87 NW. U.L.REV. 897, 918–21 (1993) (suggesting a proposal that would essentially "reestablish the common-law trust fund doctrine of shareholder liability for CERCLA response costs of a dissolved corporation"); *see also United States v. Thomas,* 515 F.Supp. 1351, 1356 (W.D.Tex.1981) ("Neither bad faith nor fraud is a prerequisite for recovery under [the trust fund] theory."). In my view, arguments that a broad-ended, reparations-based cause of action against stockholders who received distributions in good faith should be granted to late-emerging corporate claimants are properly addressed in our republic to those institutions called legislatures.

**152.** For example, Professors Hansmann and Kraakman point out this potential for abuse in their article arguing for unlimited shareholder liability for corporate torts:

> The second factor that can exacerbate inefficient incentives under limited liability is the shareholder's option to liquidate the corporation and distribute its assets before tort liability attaches. Since products and manufacturing processes often create long-term hazards that become visible only after many years, firms can—and often do—liquidate long before they can be sued by their tort victims. State law generally holds shareholders liable for a corporation's debts, including contingent tort liability, for a fixed period—commonly three to five years—after the dissolution of the firm. But many hazards may remain hidden until long after the expiration of this period.

Henry Hansmann & Reinier Kraakman, *Toward Unlimited Shareholder Liability for Corporate Torts,* 100 YALE L.J. 1879, 1884 (1991).

are already addressed by a host of other means. Those include not only the three-year period established by § 278 itself, but also by statutes that hold individuals personally accountable for their own tortious and criminal behavior as business executives.[153] Here, for example, CERCLA presented the Virgin Islands the opportunity to seek relief from Lazare and Gal not for the status crime of simply having been a Panex officer or director, but for having personally been involved in polluting activities at Laga.[154] Likewise, to the extent the Uniform Fraudulent Transfer Act might be used to hold stockholders liable for dividends or distributions from a corporation, liability would be predicated on the recipients' own state of mind.[155]

Notably, § 174 of the DGCL expressly addresses the subject of liability for the payment of illegal dividends, including those made by corporations that dissolve or become insolvent.[156] The statute provides for a cause of action against the directors authorizing the dividends, with specific proof requirements, and contains a six-year limitations period. In the event that the corporation has become insolvent or has dissolved, creditors may make such a claim. Most pertinently, the statute provides that any director who has to pay such a claim is subrogated to the corporation's rights "against stockholders who received the dividend on ... their stock with knowledge of facts indicating that such dividend ... was unlawful under this chapter, in proportion to the amounts received by the stockholders respectively." [157]

Section 174, like the fraudulent conveyance statute and § 278 itself, is evidence that the General Assembly has addressed

---

153. *E.g.*, 3A WILLIAM M. FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 1137 (2006) ("Officers and directors may be held individually liable for personal participation in tortious acts even though performed solely for the benefit of the corporation....").

154. *E.g.*, *Tutu Wells*, 994 F.Supp. at 666–75 (finding that Lazare and Gal were subject to liability under CERCLA "separate and apart from their corporate status" because CERCLA provides for owner, operator, and arranger liability).

155. *See* 6 *Del. C.* § 1301, *et. seq.* In my view, a stockholder who receives a dividend has already given equivalent value for future dividends as of the time she buys her shares. Thus, the relevant question under the Uniform Fraudulent Transfer Act becomes whether the stockholder received the dividend in good faith, i.e., without knowledge that the corporation was not in a position to lawfully pay the dividend. 6 *Del. C.* § 1308(a) ("A transfer or obligation is not voidable under § 1304(a)(1) of this title against a person who took in good faith and for a reasonably equivalent value...."). The reason that this is so, at least in this set of circumstances, is that § 1304(a)(1) would be the operative subsection of the Uniform Fraudulent Transfer Act. This defense would be unavailable under the strict liability theory the Virgin Islands would have me embrace.

Notably, even as to Panex, its directors, the Liquidating Trust, and its trustees, the Uniform Fraudulent Transfer Act would require the Virgin Islands, as a creditor who first asserted a claim after the challenged transfers, 6 *Del. C.* § 1304 (section of Act dealing with future creditors), to show that the distributions were made with an actual fraudulent intent, that the remaining assets were unreasonably small in relation to potential claims against Panex, or that the directors and trustees should have reasonably expected Panex liabilities to exceed the funds retained. 6 *Del. C.* § 1304(a). Given that the Virgin Islands did not assert a claim until 1996 and owned the property in question, given that the directors and trustees accounted for all claims that actually arose before the extended three-year period mandated by § 278 expired, and given the absence of any pled facts suggesting the directors and trustees should have known that Laga would give rise to later claims, the Virgin Islands' complaint would not even state a claim against the transferors.

156. 8 *Del. C.* § 174.

157. 8 *Del. C.* § 174(c).

in several ways the problem that inspired the trust fund doctrine.[158] Not only that, § 174's terms suggest, like the fraudulent conveyance statute, a legislative disinclination to hold stockholders liable in situations when they received a dividend or other distribution in the good faith belief that the corporation was making a lawful return to its equity holders.

There is no perfectly just or efficient answer as to how long or under what conditions the recipients of corporate funds should be accountable for later-asserted claims. Our proud history as a nation is tainted by racist, sexist, environmentally irresponsible, and sweat shop practices by businesses, practices that regrettably were often sanctioned or tolerated by the governments those empowered to vote elected. Doubtless there are those whose fortunes can be traced to businesses conducted in a manner that we would now deem repugnant. A doctrine like the one that the Virgin Islands supports would, one supposes, encourage pristine corporate behavior through the means of putting equity holders at perpetual risk that their distributions could be clawed back if later arising claimants prove that the corporation violated statutory or common law rights.

But one can acknowledge that there is a lack of perfect equity in the distribution of societal wealth and that equity holders often take profits that are inflated by externalities foisted by their corporations on others without being persuaded to adopt the trust fund doctrine. Any system of perpetual reparations, and that is essentially what the Virgin Islands seeks, comes with costs. Just as capitalism's history has its negative effects, so too has it generated a great deal of wealth for our society. That wealth generation has resulted in no small measure from the confidence that equity investors have that there is limited recourse against them. If a broad trust fund doctrine like the Virgin Islands advocates were adopted, it could affect the economy in important ways. For starters, contrary to the evident purpose of § 278 to establish a fair but discrete period within which claimants should come forward or lose their claims, the Virgin Islands suggests that our common law should countenance claims against innocent stockholders whenever later claims are made, which seems to encourage potential claimants— such as buyers of land like the Virgin Islands itself—to be less than diligent in investigating whether they possess viable

158. Section 162, the DGCL provision creating stockholder or subscriber liability for shares not paid in full up to "the sum necessary to complete the amount of the unpaid balance of the consideration for which such shares were issued or are to be issued by the corporation," is also evidence that the General Assembly has addressed the problem that prompted the development of the trust fund doctrine. 8 *Del. C.* § 162(a); *see, e.g., Sawyer v. Hoag*, 84 U.S. (17 Wall.) 610, 620, 21 L.Ed. 731 (1873) ("[W]e think it now well established that the capital stock of a corporation, especially its unpaid subscriptions, is a trust fund for the benefit of the general creditors of the corporation."). Section 162(b) gives an insolvent corporation's creditors a direct action against stockholders who have not fully paid for their shares provided that the creditors follow the procedures in § 325, namely first obtaining a judgment against the corporation and having that judgment returned unsatisfied. 8 *Del. C.* § 162(b). Similar to § 174, § 162 does not create unfettered liability. Section 162(c) protects innocent assignees and transferees who take "in good faith and without knowledge or notice that the full consideration therefor has not been paid" from personal liability. 8 *Del. C.* § 162(b). In addition, § 162(e) states that "[n]o liability under this section or under § 325 of this title shall be asserted more than 6 years after the issuance of the stock or the date of the subscription upon which the assessment is sought." 8 *Del. C.* § 162(e).

claims.[159]

 Furthermore, stockholders receiving distributions from dissolving corporations would hesitate to use those assets or to reinvest the assets for fear that the assets could be taken from them at any future time.[160] In turn, this could cause rational investors to question the wisdom of making equity investments in corporations in the first instance and reduce the social benefits that flow from such investments—things like creating jobs and sparking innovation. Here, I note that the Virgin Islands has not pled that Goldman Sachs has held the distributions it received from Panex in some separate fund for over

a generation. The Virgin Islands does not seek to have me adopt the purest form of the trust fund doctrine, which impresses a trust on specific assets received from the corporation or specific assets retained by a successor entity of the corporation after dissolution. Rather, it seeks a doctrine that puts stockholders who have changed position at perpetual risk, irrespective of the absence of scienter on their part.[161] And, of course, there are significant practical problems with trying to effect the return of corporate distributions from stockholders, especially after a great deal of time has passed between the payment of the distributions and the attempted recovery.[162]

---

**159.** *Cf. Bovay v. H.M. Byllesby & Co.,* 29 A.2d 801, 804 (Del.Ch.1943) ("Statutes of limitations are intended to prevent the enforcement of stale demands, and are based on reasons of sound policy; they are statutes of repose, intended to exact diligence."); 51 AM.JUR.2D *Limitation of Actions* § 14 (2007) ("The primary purpose of a statute of limitations is . . . to encourage promptness and diligence in bringing actions.").

**160.** *Cf. Developments in the Law Statutes of Limitations,* 63 HARV. L.REV. 1177, 1185 (1950) ("[T]he public policy of limitations lies in avoiding the disrupting effect that unsettled claims have on commercial intercourse.").

**161.** The Virgin Islands advocates the following doctrine:

> [T]he USVI's right to recovery does not depend upon Goldman's participation in or knowledge of the actions which caused the environmental damage or the subsequent assertion of claims arising from that damage. Rather, a right of restitution resides in the Successor Trustee (and now the USVI) based solely on the unfairness of Goldman retaining funds that were expressly placed in the Panex Trust and/or paid out to Goldman subject to recovery where the liabilities associated with Panex's activities were asserted during the life of the Panex Trust and reduced to judgment during the life of its legal successor.

Virgin Islands Ans. Br. at 17–18. In arguing that its right to recovery does not require bad

faith by Goldman Sachs, the Virgin Islands cites unjust enrichment case law suggesting that "[r]estitution is permitted even when the defendant retaining the benefit is not a wrongdoer." *Schock v. Nash,* 732 A.2d 217, 232 (Del.1999). The Virgin Islands, however, fails to mention that unjust enrichment requires an absence of justification for the transfer that enriches one party and impoverishes the other. *E.g., Palese v. Del. State Lottery Office,* 2006 WL 1875915, at *5 (Del. Ch.2006), *aff'd,* 913 A.2d 570 (Del.2006). That requirement usually entails some type of wrongdoing or mistake at the time of the transfer. Correspondingly, unjust enrichment is "often deployed against persons who (although not acting with scienter themselves) are sufficiently aligned with a wrongdoer that they ought to disgorge an unearned benefit conferred upon them by the wrongdoer at the victim's expense." *Teachers' Ret. Sys. of La. v. Aidinoff,* 900 A.2d 654, 673 n. 25 (Del.Ch. 2006). In my view, a passive stockholder who receives a dividend in good faith has not been unjustly enriched.

**162.** Then–Vice Chancellor Brown pointed out this same problem in *In re Citadel Industries, Inc.* 423 A.2d 500 (Del.Ch.1980). Supporting his decision not to construe Section 278's grant of power to continue a corporation beyond Section 278's three-year period as allowing the court to revive the existence of a corporation after the three-year period contemplated by the statute had already passed, he observed:

Perhaps most important of all, the adoption of the trust fund doctrine the Virgin Islands advocates would operate harshly against the corporate constituency least likely to have been involved in consciously tortious or inequitable corporate behavior; namely, the stockholders.[163] Even in today's world of activist investors, corporate managers and employees make most of the key decisions and engage in most of the conduct that affects society. As indicated, a variety of statutory and common law causes of action exist to hold corporate managers responsible for their own behavior, and those causes of action give claimants the opportunity to secure any ill-gotten wealth received by the managers themselves. Given these realities, the adoption of an unlimited stockholder-focused trust fund doctrine seems a very inefficient way to encourage corporate compliance with societal obligations.

For all these reasons, even if §§ 278 and 325(b) left room for judicial common law making, I would not recognize the Virgin Islands' claim. The Virgin Islands does not seek to hold Goldman Sachs responsible for any wrongful conduct of its own. It simply seeks to hold Goldman Sachs strictly liable for activities of Panex to the amount of liquidating distributions it received in good faith. Section 278 gave the Virgin Islands a three-year period to come forward with its claim. It did not do so, despite having owned the Laga Facility for seven years before the expiration of the three-year extension mandated by § 278. If this court were to recognize some variant of the trust fund doctrine in these circumstances, thereby extending the length of time that stockholders face exposure, statutes such as § 174 of the DGCL suggest that any such judicial creation should incorporate a scienter requirement,

> And if the corporation is so "continued" after the passage of a period of years so as to enable others to sue it, what happens if a large money judgment is obtained against it? Who pays? How are former liability insurance contracts affected? How can a vast number of former shareholders be compelled to return any final distribution of assets, etc.? In each such case these factors, along with a myriad of others, would have to be considered by this Court if it were to properly exercise its discretion to continue the entity. In the case of a large, publicly-held corporation, the task would be enormous and the potential problems and considerations would be boundless.
>
> *Id.* at 506.

163. Under the breath of the Virgin Islands' arguments has consistently been the heart-tugging notion that it, a struggling Territory grappling with an expensive environmental problem, is simply asking one of the world's most successful entities to give back what is, to it, a trifle. This sort of contention is no basis for judicial adventurism. Indeed, it highlights some practical problems with recognizing a broad-ended trust fund doctrine. The likely targets of such claims will

be big holders because, for reasons well explained in *Citadel*, it will be difficult to collect from disaggregated public stockholders who received distributions. Admittedly, the ever-increasing share of stock owned by institutions, now above 70%, makes collection efforts easier. But that phenomenon raises another policy point that has distributional and fairness implications. Many of the larger holders of corporations are mutual funds and pension funds. These holders are the fiduciaries for ordinary investors, such as Americans saving for college and retirement. Recognizing trust fund claims against holders could result in a mutual fund, whose stockholders are now quite different, being subject to return a distribution a generation later, in the world as the Virgin Islands would have it. In such a case, it would be the end-user investor who would suffer. Similarly, the trustees of a pension fund could find themselves facing an order to return a long-forgotten distribution at a time when the fund was struggling for other reasons to meet its obligations to pensioners. Suffice it to say, the reality that Goldman Sachs is a wealthy entity is no basis for the formulation of common law affecting others, nor would it be just for a court to enter a judgment against a party simply be-

a requirement that even in a very weak form would preclude the Virgin Islands from proceeding against Goldman Sachs.

Before ending this discussion, I must note the cognitive dissonance arguably injected by the General Assembly's adoption in 1987 of substantial amendments to the DGCL's provisions relating to dissolution ("1987 Amendments").[164] Those amendments do not apply to the Panex dissolution but arguably give some sense of what a later General Assembly believed that the pre-existing provisions of the DGCL meant.

The 1987 Amendments created a detailed process, which involves judicial involvement, by which dissolving corporations can essentially smoke out claims, pay off claims in accordance with statutory priorities, and establish reserves for contingent claims. By this more detailed method of dissolution, which is optional and set forth in § 281(a), the dissolving corporation's directors and stockholders are rewarded with more certainty and liability protection.[165] The statute also sets forth notice requirements that dissolving corporations wishing to use this more rigorous process have to follow to alert creditors of the dissolution.[166]

As one would expect, the Virgin Islands latches on to one of the 1987 Amendments in particular. That amendment created § 282(b) and purports to provide the following protection only to stockholders of dissolving corporations that follow the more rigorous dissolution process set forth in § 281(a). That section states that a "stockholder of a dissolved corporation the assets of which were distributed pursuant to § 281(a) of this title shall not be liable for any claim against the corporation on which an action, suit or proceeding is not begun prior to the expiration of the period described in § 278 of this title."[167] Section 282(c) also states more generally that the stockholders of a dissolved corporation who received distributions made under either the more rigorous process, § 281(a), or the less exacting one, set forth in § 281(b), "shall not be liable for any claim against the corporation in an amount in excess of such stockholder's pro rata share of the claim or the amount so distributed to such stockholder, whichever is less."[168]

Using § 282(b), the Virgin Islands makes a simple argument. If that section must be construed as having some intended effect, it must preclude a reading of the pre-existing §§ 278 and 325(b) as barring claims against stockholders after the

---

cause the party could pay it without great pain.

164. *See generally* Stephen P. Lamb and Robert A. Glen, *The 1987 Delaware Law of Voluntary Corporate Dissolution*, 13 Del. J. Corp. L. 11 (1988). The primary amendment to the DGCL's dissolution provisions occurred in 1987, with additional relevant amendments occurring in 1990, 1991, and 1994. *See* Rodman Ward, Jr., Edward P. Welch & Andrew J. Turezyn, Folk on the Delaware General Corporation Law §§ 280–82 (4th ed.). I refer to those changes collectively as the 1987 Amendments.

165. 8 *Del. C.* § 281(a).

166. 8 *Del. C.* § 280.

167. 8 *Del. C.* § 282(b).

168. 8 *Del. C.* § 282(a). The current pro rata liability standard calls attention to the Virgin Islands' attempt to hold Goldman Sachs, a passive minority stockholder, liable for *all* of its liquidating distributions. By contrast, the Virgin Islands settled with Firmanco, an active blockholder, for only $1.6 million, or less than five percent of its liquidating distributions. Am. Compl. ¶ 51 (noting that the Virgin Islands settled with Firmanco for $1.6 million); *Tutu Wells*, 885 F.Supp. at 781 (totaling Firmanco's liquidating distributions as $35.5 million). Under pro rata liability, Goldman Sachs would only be liable for 13% of the $51.6 million default judgment or approximately $6.7 million.

three-year extension on the corporation's existence under § 278 expired. Otherwise, there would be no reward for following the more rigorous § 281(a) process.

The problem for the Virgin Islands is that the 1987 Amendments do nothing to address the truly pertinent question: what causes of action, if any, does a claimant against a dissolved corporation who first asserted claims after the corporation's extended existence under § 278 have against an innocent stockholder who received distributions during the dissolution process? Neither the 1987 Amendments themselves nor learned commentary on those amendments answers that question. The first decision to address the 1987 Amendments expressly noted that there was no clarity on this question.[169]

In fact, the 1987 Amendments were in large measure driven by the lack of certainty about issues of that kind. Rather than attempt to state what causes of action, if any, actually existed in these circumstances, the amendments instead simply created greater insulation against these causes of action—if and whatever they were—for stockholders whose corporations used the new § 281(a) dissolution process.[170] Notably, commentary on the amendments do not reference § 325(b) or its implications.

In my view, I cannot responsibly read amendments that were designed to address uncertainty but whose authors clearly recognized that continuing uncertainty remained as somehow suggesting that a trust fund doctrine claim of the type the Virgin Islands now makes was viable in Delaware before these amendments. Nor do the 1987 Amendments illuminate the appropriate contours for trust fund doctrine claims in this context. That the 1987 Amendments injected more rigor into the overall dissolution process—a rigor beneficial to creditors of all kinds, including those with contingent claims—and used § 282(b) as an incentive, does not mean that the General Assembly was implicitly creating or somehow recognizing the existence of a cause of action holding innocent stockholders strictly liable to return distributions received in dissolution whenever a later-arising creditor obtains a judgment based solely on the harm caused by a corporation's pre-dissolution activities.

If there is a gap in our law to fill, the General Assembly is the body with the legitimacy and tools to best balance the important policy considerations at stake. And if common law were to be made, it should be at the instance of a later arising claimant who can at least prove that the

---

**169.** In *In re RegO Co.*, Chancellor Allen observed:

> This modern scheme still leaves open the question, what, if any, rights are afforded to persons who have no claim against a corporation at the time of its dissolution, or during the statutory wind-up period, but who do thereafter acquire such a claim. Such a person might, for example, be a tort claimant who is injured by an arguably defective product some time after, perhaps years after, the corporation has been dissolved, and its affairs finally wound-up. It would seem apparent that such a person could not sue the dissolved corporation itself. Section 278 continues the corporation's existence beyond the statutory three year winding-up period "solely" for the purpose of concluding pending litigation. But has such a person a cognizable claim against others—against directors or shareholders most notably?
>
> This I take to be an unclear and a troubling question.

623 A.2d at 96 (internal citation omitted).

**170.** *See Marsh*, 499 F.3d at 175 n. 5 ("[S]ections 280–282 do not recognize the continued vitality of the trust fund doctrine, but rather foreclose the use of the trust fund doctrine for post-dissolution claims, provided dissolved corporations follow the procedures outlined in section 281(a).").

directors of the dissolving corporation engaged in some act of inequity during the dissolution process, by disregarding the corporation's likely obligations to some specific contingent creditor or class of contingent creditors. The Virgin Islands is not in that category. Even if it were, I would not embrace, as a matter of our common law, the notion that a stockholder who received a distribution without knowledge of the directors' inequitable conduct—i.e., in good faith and without scienter—should be exposed to a suit beyond the three-year extension period set forth in § 278. Both fairness and efficiency at that temporal point seem to weigh, for reasons previously articulated, in favor of affording repose to the innocent recipient.

C. *Does The Virgin Islands Have A Claim Against Goldman Sachs Because Of The Existence Of The Liquidating And Successor Trusts?*

 The Virgin Islands contends that the existence of the Liquidating Trust after the three-year statutory period allows it to maintain its claims against the former stockholders of Panex. The Virgin Islands asserts that, according to *City Investing*, had Panex obtained court approval to continue its existence beyond the three-year statutory period as opposed to creating the Liquidating Trust there would be no question that the Virgin Islands could have

asserted its claims directly against Panex during that extended wind-up period.[171] Therefore, because its "claims against Panex and its legal successors survived beyond the three year period, so too the [Virgin Islands'] ability to seek recovery of the liquidating distributions extended beyond that three year period."[172] The Virgin Islands cites no legal authority for this conclusion. As Judge Stapleton accurately wrote for the Third Circuit in *Tutu Wells*, *City Investing* stands only for the proposition that a creditor of a dissolved corporation can sue that corporation's liquidating trust if it is in existence at the time of suit.

Although the Trust Agreement stated that the Liquidating Trust was established for the purpose of "satisfying any and all liabilities of Panex which are not paid or otherwise discharged,"[173] the Trust Agreement continued the Liquidating Trust beyond three years only for the "purpose of discharging any known liabilities of the Trust or of Panex or liabilities of the Trust or of Panex which the Trustees have reasonable grounds to believe may be asserted."[174] As admitted by the Virgin Islands, it did not provide notice of its claims to the trustees of the Liquidating Trust within three years. Nor has it pled facts supporting a rational inference that the trustees had reasonable grounds that claims might be raised regarding Panex's opera-

171. The Virgin Islands points to the following discussion in *City Investing*:

City Trust's efforts to restrict its liability to claims filed within three years of City's dissolution does not accommodate the statutory method for the assertion of creditors' claims nor the purpose behind its adoption. By distributing its assets to a trust, City was able to achieve substantial tax savings but at the same time it extended its winding-up period by transferring its operations to a separate legal entity—City Trust. Had City elected to seek court approval to continue its existence "for such longer period" be-

yond the three year term as necessary to wind up its affairs instead of creating City Trust, there is little question that its assets would be reachable by its creditor and subject to claims at the time Continental filed its claim in 1990.
624 A.2d at 1196.

172. Virgin Islands Ans. Br. at 32.

173. Trust Agreement ¶ 3.1.

174. *Id.* ¶ 8.1.

tions at Laga.[175] That is, of course, not surprising given that Panex Co. had sold Laga to the Virgin Islands itself in 1981, some seven years before the expiration of Panex's winding-up period, and had not had any complaints.

Thus, I interpret the Virgin Islands assertions as arguing that the language in *City Investing* regarding the general purposes for liquidating trusts somehow provides me with a basis for invalidating the Liquidating Trust's language limiting the purpose of its existence after three years to known or noticed claims. I do not read *City Investing* the same way the Virgin Islands does. *City Investing* simply acknowledges that one principled way for dissolving a corporation that wishes to obtain the federal tax benefits that come with distributing its assets within one year is to form a liquidating trust to assume corporate liabilities.[176] Nothing in *City Investing* suggests that a liquidating trust must exist perpetually as a corporate successor, capable of being sued on all claims upon which the corporation could have been sued. Rather, it simply recognizes that a dissolving corporation must responsibly address its potential liabilities and that a liquidating trust may be used for that purpose.

Here, Panex established the Liquidating Trust for just that purpose. For an initial period of three years from the execution of the Trust Agreement—that is until September 12, 1988 or approximately five months later than the expiration of the three-year winding-up period after Panex's filing of its certificate of dissolution required by § 278—the Liquidating Trust was a general successor to Panex and was responsible for discharging any liabilities of Panex. Beyond that time, however, the Liquidating Trust could only be continued to deal with specific claims or liabilities that were pending and unresolved, or potential claims the Trustees had reasonable

175. When given the opportunity at oral argument to point out any pled facts suggesting that the trustees of the Liquidating Trust knew about or should have had reason to expect the potential environmental claims in the Virgin Islands before the expiration of Liquidating Trust's three-year period of unlimited existence, counsel for the Virgin Islands could not identify any:

> THE COURT: There's not one fact pled that anyone gave notice to the trustees or to any former director or officer of Panex before that three year period of these potential claims; correct?
> MR. JAMESON: Specifically of the pollution in the Virgin Islands—no—.

Tr. *Of Oral Arg. On Def's Mot. To Dismiss* (Sept. 27, 2007) at 40–41. The Virgin Islands did advance the argument that the trustees should have anticipated the potential environmental liability in the Virgin Islands once they became aware of the potential environmental liability in New York. *Id.* at 47–49. That argument lacks logical force, especially since the Virgin Islands itself never raised a peep until fifteen years after it owned Laga. The source and type of contamination in New York were completely different from the source and type of contamination in the Virgin Islands. *Compare New York v. Panex Indus., Inc.*, 1996 WL 378172, at *2 (W.D.N.Y. 1996) (describing the allegations of pollution in New York as resulting from a "button-manufacturing facility ... which ... arranged for the disposal at the Landfill of hazardous substances produced by the manufacturing facility including styrene, TCE, methylene chloride, toluene, and lead carbonate") *with Tutu Wells*, 994 F.Supp. at 642 ("The primary chemical discovered on Laga's property was PCE, which had been allegedly discharged via underground pipes into the ground as a result of Laga's on-site dry cleaning operations-a final step in the manufacturing process of Laga's textile products.").

176. 624 A.2d at 1196; *see also Marsh*, 499 F.3d at 175, n. 6 (reading *City Investing* and *Rosenbloom* as being of no avail to New York in arguing its trust fund claims against Panex's former stockholders because those decisions did not shed any light on whether the former stockholders of dissolved corporations faced liability under the trust fund doctrine).

grounds to believe existed. That is, after the expiration of the three years from the execution of the Trust Agreement, the Liquidating Trust was not a general successor to Panex at all; it was a specific trust designed to assume responsibility only for defined liabilities of Panex. Laga-related claims were not within that scope of responsibility.

*City Investing* actually supports the proposition that the instrument creating the Panex Liquidating Trust should be enforced in accordance with its clear and unambiguous terms. In *City Investing*, the Supreme Court rejected a consideration of extrinsic evidence regarding the intent behind the creation of the liquidating trust at issue in that case, affirming this court's holding that the trust language was clear and unambiguous and should be enforced in accordance with its plain meaning.[177]

That the Supreme Court would enforce a trust instrument is hardly surprising. The beneficiaries of a liquidating trust typically include, as they do in this case, the stockholders of the dissolving corporation. Those stockholders are entitled to have their contractual expectations honored. Here, the Liquidating Trust's terms provided for its end as a general successor of Panex on September 12, 1988 and Goldman Sachs is entitled to have that instrument enforced.

Furthermore, the Panex Liquidating Trust is clearly distinguishable from the liquidating trust at issue in *City Investing*. In *City Investing*, the trustees extended the life of a liquidating trust past its original three-year period because they could not wind-up City's affairs within that time period and had yet to liquidate all of the trust's assets.[178] The *City Investing* liquidating trust had assumed all responsibilities for the dissolved corporation and there was no contractual bar on extensions of the trust. Therefore, the Supreme Court held that the trustees were within their authority to extend the trust's existence, an extension that did not violate the trust instrument. Because the trust's terms made it a general successor to the dissolved corporation, it could be sued on all claims that could have been brought against the dissolved corporation.

The situation here is starkly different. By the plain terms of the Trust Agreement, the Liquidating Trust expired as a general successor to Panex on September 12, 1988, and could live beyond that date only for another nine years as to specific purposes. That such a structure is rational and fair finds support in the second sentence of § 278 itself, which extends the life of the corporation for any action pending at the end of the three-year statutory wind-up period solely for the purpose of that action.[179] Indeed, to override the Trust Agreement and find that the Liquidating Trust existed as a general successor to Panex after September 12, 1988 would be at odds with this court's holding in *In*

**177.** *Id.* at 1197–98.

**178.** *Id.* at 1193.

**179.** The fact that the word "solely" did not exist in § 278 at the time of Panex's dissolution does not undermine this argument because § 278 has always been interpreted as if it contained the word "solely." The General Assembly's commentary to the amendment adding the word "solely" supports this conclusion: "Section 278 is amended to make clear that ... the continuation of a corporation's legal existence beyond the period described in Section 278 by reason of the pendency of an action, suit or proceeding is solely for the purpose of that action, suit or proceeding." RODMAN WARD, JR., EDWARD P. WELCH & ANDREW J. TUREZYN, FOLK ON THE DELAWARE GENERAL CORPORATION LAW §§ 278.1 n. 2 (4th ed.).

re Citadel Industries, Inc.[180] In that case, then-Vice Chancellor Brown refused to grant a petition to revive a corporation after the expiration of § 278's three-year period for the purpose of allowing a claim to be brought against it, finding that § 278 barred that result, for the obvious reason that such a revival would substitute the judiciary's appropriate view of the period during which a dissolving corporation should remain at jeopardy of suit for the General Assembly's.[181]

When the Liquidating Trust was continued in existence after September 12, 1988, the sole reason that the Liquidating Trust was continued was the environmental claim in New York. As a result, the Virgin Islands cannot use a judgment against the Liquidating Trust as a basis to claim over against Goldman Sachs. The Liquidating Trust ceased to be a general successor of Panex on September 12, 1988, and the Virgin Islands did not sue it until 1996, some eight years after that point. As a result, the Virgin Islands has no claim against Goldman Sachs for the distributions it received from Panex.

Likewise, because the Liquidating Trust faced no liability to the Virgin Islands for Laga-related claims, the Liquidating Trust had no basis to seek recoupment of distributions it made to its beneficiaries in 1987. Therefore, to the extent that the Virgin Islands bases its right of recovery on the assignment it received of the Successor Trust's recoupment rights, it has no claim. The Successor Trust only inherited whatever rights of recoupment the Liquidating Trust had as of September 12, 1997. Because the Liquidating Trust was not subject to liability on Laga-related claims, it had no right to seek recoupment from Goldman Sachs.[182]

Similarly, because the trustees of the Liquidating Trust were only empowered to administer that Trust's assets, they never had any authority to seek recoupment of distributions Panex stockholders received from Panex itself, rather than the Liquidating Trust. As the inheritor of those trustees' rights, the Virgin Islands therefore has no basis to seek recoupment of the distributions Goldman Sachs received from Panex.

In holding that the Virgin Islands has no viable claim against Goldman Sachs as an assignee of the Successor Trust, I must address the Virgin Islands' argument that I have somehow undermined the only possible utility served by the Successor Trust's creation. As explained previously,

---

180. 423 A.2d 500 (Del.Ch.1980).

181. Citadel, 423 A.2d at 503–04.

182. Interestingly, City Investing can be read as undercutting the Virgin Islands' recoupment and trust fund doctrine claims in another respect. In the course of ruling that the liquidating trust in that case was responsible for addressing a corporate liability, the Supreme Court specifically noted that its willingness to allow claims against the liquidating trust would not prejudice the dissolving corporation's stockholders because a "partial, but substantial, distribution to City's shareholders [had] already been accomplished." City Investing, 624 A.2d at 1196. This suggests that the Supreme Court did not believe that the stockholders needed to worry that they would be asked to return previously-received distributions simply because a later-arising claim was made; rather, the claim would have to be satisfied by whatever funds were remaining in the trust. In that respect, this court's Citadel decision also suggests that § 279 of the DGCL, which deals with the appointment of receivers for dissolved corporations, only permits receivers to address claims arising after the three-year period in § 278 has expired using assets still in the possession of the corporation. 423 A.2d at 506 ("Where there are no undistributed assets against which to effect a recovery, § 279 provides little solace to one possessing an after-discovered claim against a dissolved corporation.").

the Successor Trust was created to ensure that no one was prejudiced by the imminent expiration of the Liquidating Trust. The fact that the Successor Trust did not turn out to be the elixir the Virgin Islands and New York hoped is of no moment. The Virgin Islands got what it bargained for, insofar as the Successor Trust assumed all the rights and obligations of the Liquidating Trust as of September 12, 1997. The reality is that those rights and obligations did not, per the clear terms of the Liquidating Trust Agreement, extend to Laga. That it took until the end of 2007 to find that out is due largely to the Virgin Island's languid approach to pressing its claims.

Furthermore, the Virgin Islands was able to reach settlements with Lazare, Gal, Firmanco, and Rosenbloom, a benefit to it that was likely due in some measure to the continued existence of the Successor Trust. And it appears probable that the Successor Trust fulfilled some role in providing assistance to the former Panex directors and officers in defending claims against them.

### D. Does The Virgin Islands Have A Promissory Or Equitable Estoppel Claim Against Goldman Sachs?

■ The Virgin Islands, in both its own capacity and as an assignee of the Successor Trust, argues that it has promissory and equitable estoppel claims against Goldman Sachs. The Virgin Islands contends that the former stockholders' rights to the liquidating distributions from Panex were quasi-contractual in nature and that disclosures to the Panex stockholders in the Proxy Statement regarding their possible future liability for distributions re-

ceived estop Goldman Sachs. The Virgin Islands claims that it has a right to enforce its promissory estoppel claims as assignee of the rights of the Successor Trust because the Successor Trust had the right to enforce these quasi-contractual rights as a party to the quasi-contract.

The Virgin Islands also asserts that as a creditor it has the right to enforce these quasi-contractual rights as a third party beneficiary of the quasi-contract. The Virgin Islands' equitable estoppel claims are almost exactly the same as its promissory estoppel claims. The only difference is that the Virgin Islands' frames its equitable estoppel claims in reference to Goldman Sachs' vote in favor of the Liquidation Plan and its acceptance of the conditional liquidating distributions rather than the alleged promise of recovery in the Proxy Statement.

■ Under Delaware law, a plaintiff asserting a claim for promissory estoppel must show by clear and convincing evidence that: "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[183] The promise must be a real promise—mere expressions of expectation, opinion, or assumption are insufficient.[184] The promise must also be reasonably definite and certain.[185] Equitable estoppel is based on similar principles. To make out a claim of equitable estoppel, the Virgin Islands must show that it was induced to rely

**183.** *Chrysler Corp. v. Chaplake Holdings, Ltd.,* 822 A.2d 1024, 1032 (Del.2003).

**184.** *E.g., Metro. Convoy Corp. v. Chrysler Corp.,* 208 A.2d 519, 521 (Del.1965).

**185.** *E.g., Cont'l Ins. Co. v. Rutledge & Co.,* 750 A.2d 1219, 1233 (Del.Ch.2000).

detrimentally on Goldman Sachs' conduct.[186]

■ These estoppel arguments fail the straight face test. The Proxy Statement disclosure that the Virgin Islands claims created the contract or quasi-contract with Goldman Sachs states: "If the amount held in the Liquidating Trust is insufficient to discharge fully all liabilities which arise, or if liabilities arise after the Liquidating Trust is terminated, each Panex stockholder *may* be liable for any unpaid portion of such liabilities to the extent of the liquidating distributions paid to him."[187] Descriptive statements in disclosure statements do not amount to a promise.[188] This disclosure did nothing more than warn the Panex stockholders of the jurisprudential reality that the status of Delaware law, and American law more generally, regarding the liability of stockholders receiving distributions from a dissolving corporation was uncertain. That is, the disclosure by the Panex directors simply alerted Panex stockholders to a risk they faced. The idea that this sort of warning about a possible future litigation risk could give risk to a later estoppel claim is not one the Virgin Islands buttresses with citation to relevant authority, and that omission is unsurprising.

Delaware law encourages directors to provide stockholders with material information relevant to their voting decisions.[189] Treating warnings regarding possible future risks as a sufficiently binding promise to support a later estoppel claim would discourage full disclosure of risks.

Even worse, it would inject uncertainty into relationships that ought to have clarity. To wit, in this instance, what Goldman Sachs and other Panex stockholders were asked to approve was a Liquidation Plan and a Liquidating Trust Agreement.[190] But the Virgin Islands is unable to identify any statements in the Liquidation Plan or the Liquidating Trust Agreement providing for the right of Panex or the Liquidating Trust to seek recovery of the liquidating distributions.[191] It is hardly unprecedented for trust agreements or other governing documents such as limited partnership agreements to provide a provision requiring beneficiaries to respond to capital calls at the request of the entity when necessary to meet its needs. The Liquidating Trust Agreement could have been crafted to include just such a provision, which would have re-

186. *E.g., VonFeldt v. Stifel Fin. Corp.,* 714 A.2d 79, 87 (Del.1998).

187. Proxy Statement at 6 (emphasis added).

188. *VonFeldt,* 714 A.2d at 87.

189. *E.g., Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.,* 824 A.2d 11, 15 (Del. Ch.2002) ("[U]nder Delaware law, the fiduciary duties of directors require that they disclose fully and with complete candor all material facts when they solicit proxies from stockholders.... [T]hat duty is best discharged through a broad rather than a restrictive approach to disclosure ....") (internal quotation omitted).

190. Proxy Statement Exs. A & B.

191. The Successor Trustee, the party whose shoes the Virgin Islands now stands in one of its capacities, essentially admitted that the Liquidation Plan and Panex Trust do not explicitly provide a basis for recovery of the liquidating distributions by alleging that the original trustees of the Panex Trust breached their fiduciary duties by "failing—before such distribution occurred—to obtain an express undertaking from the beneficiaries" that the liquidating distributions from the Panex Trust would be returned, "if necessary, to allow the Liquidating Trust to satisfy its obligations." 1998 Petition For Declaratory Judgment at 1. No such express undertaking would have been necessary if it existed in the Liquidation Plan or Trust Agreement.

quired recipients to promise to return any distributions received if necessary for the Trustee to satisfy a liability relating to Panex's pre-dissolution activities. Similarly, a contract of this kind could have been the condition on which Panex made its last distributions as a corporation. But no such obligation was ever imposed on the recipients and it would be unreasonable to read the warning language in the Proxy Statement as implicitly forming such a contract, especially when that language does not in the slightest suggest that the recipients of distributions would face a demand for recovery from the Liquidating Trust itself.

■ To the extent that the Virgin Islands claims that the disclosures in the Proxy Statement formed some quasi-contract between the Panex stockholders and those claiming to be Panex creditors, that claim is even less tenable, if that be possible. To turn a warning to stockholders that they may face liability at the instance of a later-arising creditor into a binding promise by the stockholders to give the dissolving corporation back the funds they received from the corporation (or its liquidating trust) would convert the warning of possible liability into a confession of judgment. By judicial fiat—a full generation later—may becomes a contractually binding shall! This reading would also have the effect of turning the warning disclosure into an expansion of the liability faced by Panex stockholders. As the Virgin Islands would have it, the warning disclosure estopped the Panex stockholders from failing to return distributions they received if the Liquidating Trust needed them to satisfy a judgment against it, even if that judgment was based on a Panex liability that the Liquidating Trust Agreement's own terms excluded the Liquidating Trust from bearing. In the case of the Virgin Islands' claims related to Laga, the Liqui-

dating Trust Agreement did just that. But the Virgin Islands would have the warning disclosure act as a de facto modification of that Agreement, rendering sound principles of contract ineffective and creating a precedent that would generate commercial uncertainty. And, of course, the idea that such a warning was intended in any way to benefit future creditors by giving them enforceable rights is textually unsupported and contextually absurd.

The Virgin Islands has also unsurprisingly failed to plead reasonable reliance by itself or the trustees of the Liquidating Trust on the warning disclosure. For the preceding reasons, it is clear as a matter of law that the warning disclosure could not have been reasonably relied upon by either the trustees of the Liquidating Trust or Panex creditors as a behavior-changing promise.

The Virgin Islands' so-called estoppel claims shall be dismissed.

### E. Are The Virgin Islands' Claims Time–Barred?

The Virgin Islands did not bring this suit until October 30, 2006. This was a full *twenty-five years after* the Virgin Islands bought Laga from Panex Co. This was *twenty-one years after* Panex dissolved. This was *eighteen years after* the three-year period under § 278 expired and after the Liquidating Trust's status as a general successor to Panex for liability purposes ended. This was *fourteen years after* the VI Environmental Litigation first raised the possibility that contamination had occurred at Laga. This was *ten years after* the claims against Goldman Sachs by the Virgin Islands in the VI Environmental Litigation were dismissed without prejudice. This was *five years after* Vice Chancellor Jacobs denied the petition of the Successor Trustee for recoupment in part because the Successor Trustee had failed

to join the former Panex stockholders as interested parties.

■ Because of this record of torpidity, Goldman Sachs argues that the Virgin Islands' claims are barred by the doctrine of laches. I agree with that argument.

The analogous statute of limitations for the Virgin Islands' unjust enrichment/trust fund and recoupment claims is the three-year period contained in 10 *Del. C.* § 8106.[192] Goldman Sachs argued that that was the case in its opening brief and the Virgin Islands did not refute that assertion.[193] Moreover, the Virgin Islands seeks money damages which is usually an action at law that would generally be subject to the three-year limitation period of 10 *Del. C.* § 8106.[194] Finally, the Virgin Islands' estoppel claims are analogous to quasi-contractual claims which would also be subject to 10 *Del. C.* § 8106.

In its complaint, the Virgin Islands pleads no basis for equitable tolling of the statute of limitations. Frankly, sound arguments can be raised that the Virgin Islands should have been barred by laches from suing Panex after 1984 for any conditions at the Laga Facility. Having let three years expire without arguing that Panex breached any contractual obligation or any affirmative representation as to the condition of the Laga Facility or the earth and water under it, the Virgin Islands was poorly positioned to sue at a later date. That is especially so given that it was in possession of Laga, had every incentive before and after purchase to investigate whether the site was a source of pollution, and that its own conduct on the site could have changed the condition of the land and generated pollution.[195]

But I need not base my ruling on whether the Virgin Islands should have sued during the Reagan Administration; it is enough that they waited until the second term of the second Bush Administration to bring this case. By 1992, the Virgin Islands clearly knew that parties in the VI Environmental Litigation were attributing pollution to Laga. By the time it got in the game, the Virgin Islands clearly knew that Panex was long dissolved. Under the theory it now espouses, the Virgin Islands had a right to bring a trust fund claim against Goldman Sachs then.[196]

Indeed, the Virgin Islands asserted claims substantively identical to those it

---

192. *E.g., Wal–Mart Stores v. AIG Life Ins. Co.,* 860 A.2d 312, 319 (Del.2004) ("[T]he applicable statute of limitations is 10 *Del. C.* § 8106, which imposes a three year period of limitations on Wal–Mart's tort, contract, and fiduciary duty claims...."). I note the reality that I have found that § 278 itself acts effectively as a time bar. This section treats the laches question as if § 278 was no bar to the Virgin Islands.

193. Goldman Sachs Op. Br. at 47–49; Virgin Islands Ans. Br. at 46–48.

194. *Atlantis Plastics Corp.,* 558 A.2d at 1064 ("A claim brought in this Court which seeks money damages, which is generally an action at law, will therefore generally be subject to the three year limitations period of 10 *Del. C.* § 8106.").

195. The Virgin Islands—a quarter of a century after the sale—now alleges that "Panex Co. sold the Laga facility property to the Government of the U.S. Virgin Islands Department of Education for use as an education complex for children without revealing that the facility had been used for disposal of toxic chemicals." Am. Compl. ¶ 16. Of course, if that be true, the Virgin Islands had a powerful incentive to inspect the site closely and to conduct environmental testing.

196. *See* Henry G. Henn & John R. Alexander, *Effect of Corporate Dissolution on Products Liability Claims,* 56 Cornell L.Rev. 865, 894, 909 n. 222 (1971) ("Under the 'trust fund theory,' ... [c]laimants, even with unliquidated claims, would have standing to sue, absent laches or any applicable statute of limitations").

now advances in the VI Environmental Litigation in 1996. Those claims, which were arguably time-barred when they were brought in 1996 because the latest liquidating distribution was made in 1987, were dismissed without prejudice and without a tolling of the statute of limitations. Moreover, the Successor Trust was aware of its potential claims at the inception of its existence in 1997—the Order creating the Successor Trust clearly describes one of the purposes of the Successor Trust as investigating and pursuing, if desirable, recoupment of the liquidating distributions. But the Successor Trustee never sued Goldman Sachs, even after Vice Chancellor Jacobs cited to the failure to do so as a basis for dismissing the Successor Trustee's recoupment petition. As an assignee of the Successor Trust, the Virgin Islands is stuck with that record of inaction.

As a result, having only filed this suit in 2007, the Virgin Islands, whether in its guise as a creditor or an assignee of the Successor Trust, has clearly exceeded the analogous three-year statute of limitations for bringing its claims against Goldman Sachs. The Virgin Islands fails to assert any unusual circumstances justifying its delay,[197] and thus its claims are time-barred.

In this court, a party's failure to file within the analogous statute of limitation is, absent a tolling of the limitations period, typically conclusive evidence of laches.[198] But the doctrine of laches also permits this court to hold a plaintiff to a shorter period if, in terms of equity, the plaintiff should have acted with greater alacrity, and when the plaintiff's failure to seek equitable relief with alacrity threatens prejudice to the other party.[199]

It is difficult to imagine a clearer instance of prejudicial delay.[200] Goldman Sachs was a passive stockholder with no direct knowledge of or role in the Laga operations. The Virgin Islands seeks to base a recovery against Goldman Sachs on a default judgment it obtained against a penniless Successor Trust. The District Court issuing that judgment had previously acknowledged that there were serious questions regarding whether the Virgin Islands was the party culpable for any polluting releases from Laga.

As a matter of due process and equity, I cannot conceive of how this court would permit the Virgin Islands to use that type of judgment collaterally against Goldman

197. The Virgin Islands does contend that it could not bring its claims as assignee of the rights of the Successor Trust until it was assigned these rights in 2006. Although this statement is factually accurate, it does not support the Virgin Islands' claim that laches should not apply because it ignores the fact that the Virgin Islands stands in the shoes of the Successor Trust, which did not bring its claim in a timely manner and would itself be time-barred.

198. *E.g., Albert v. Alex. Brown Mgmt. Servs.,* 2005 WL 1594085, at *12 (Del.Ch.2005) ("In the absence of unusual or mitigating circumstances, where the analogous statute of limitations at law period has run, a plaintiff is barred from bringing suit without the necessi-

ty of the court engaging in a traditional laches analysis.").

199. *E.g., CertainTeed Corp. v. Celotex Corp.,* 2005 WL 217032, at *6 (Del.Ch.2005) (noting that with respect to equitable claims such as an injunction or specific performance laches may apply earlier than the end of the period of the analogous statute of limitations "if a plaintiff sits on its claim and does not demand prompt action.").

200. *See Fike v. Ruger,* 752 A.2d 112, 113 (Del. 2000) ("The essential elements of laches are: (i) plaintiff must have knowledge of the claim and (ii) there must be prejudice to the defendant arising from an unreasonable delay by plaintiff in bringing the claim.").

Sachs without affording Goldman Sachs an attempt to address the underlying merits. Of course, the Virgin Islands would say that the Successor Trust was penniless because distributions were made by Panex back in 1987 that should not have been. But by 1987, the Virgin Islands had owned Laga for six years and had had ample time to investigate conditions there.

In attempting to mount a merits-based defense, Goldman Sachs would have to reconstruct a chain of events going back to the 1970s to which it was not a party. Not only would key witnesses' memories have faded, some are no longer among the living. Lazare, a key director and officer of Panex and one of the two trustees of the Liquidating Trust, died in 1999 and would be unavailable to testify.[201] This sort of evidentiary prejudice clearly supports a finding of laches.[202] Compounding the reality that Goldman Sachs would be compromised by the passage of time in mounting a defense is the reality that the expense of doing so would likely not be cost-effective. The Virgin Islands would therefore benefit from its tardiness by being able to extract funds from Goldman Sachs, not because of the merits, but simply so Goldman Sachs could avoid the burden of defending the action. Just because Gold-

man Sachs is in the plush does not mean that it should be subjected to this type of pressure by an extraordinarily slow moving plaintiff.[203]

Furthermore, the Virgin Islands itself asserts that the conduct of Panex's directors might be relevant to a fair determination of its claims, in the sense that if a trust fund doctrine claim was recognized, a court might only allow a plaintiff to prevail if it proved that the fiduciaries who made distributions acted inequitably in failing to provide for certain claims (or possible claims). To that point, the Virgin Islands invites me to examine the liquidation plan and liquidating dividends of the mid–1980s, by determining "whether retention of less than 10% of the dissolving corporation's assets was reasonable."[204] This re-illustrates the problem. Lazare was one of the final directors of Panex and a trustee of the Liquidating Trust. Gal and Rosenbloom are alive but doubtless their memories about events twenty years ago have faded.

## IV. Conclusion

For the foregoing reasons, Goldman Sachs' motion to dismiss is granted. IT IS

201. *See Rosenbloom,* 766 A.2d at 451 (showing Lazare represented by the executors of his estate in 2000); *see, e.g., Fike,* 752 A.2d at 114 (finding prejudice where key witnesses died while the plaintiff sat on its claim).

202. *Steele v. Ratledge,* 2002 WL 31260990, at * 3 (Del.Ch.2002).

203. As noted previously, the Virgin Islands did reach settlements with the Panex stockholders who served as directors and officers. Thus, it is not as if it did not obtain some recompense from those most directly involved in any polluting activities by Panex at Laga. And as a matter of proportion, it is worth noting that the Virgin Islands settled for a total of $9.3 million from Esso and Texaco in the VI Environmental Litigation, even though

those parties were supposedly responsible for over 65% of the damage to the Tutu aquifer. *In re Tutu Water Wells CERCLA Litig.,* 326 F.3d 201, 206 (3d Cir.2003). However rich Goldman Sachs is, it was a passive investor who owned 13% of Panex, which was allegedly responsible for less than 20% of the damage in St. Thomas. *Id.* Now the Virgin Islands seeks to have Goldman Sachs pay $9 million it received twenty years ago in good faith.

204. Virgin Islands Ans. Br. at 21 (arguing that "[s]uch factual inquiry is relevant in determining who in equity, as between Goldman and the citizens of the Virgin Islands, should bear the cost of the environmental damage suffered on St. Thomas.").

SO ORDERED. Each side to bear its own costs.